In the Matter of the Application of STORK RESTAURANT, INC., Appellant, against JOHN P. BOLAND and Others, Constituting the New York State Labor Relations Board, Respondent. (Appeal No. 1.)

In the Matter of NEW YORK STATE LABOR RELATIONS BOARD, Respondent, against STORK RESTAURANT, INC., Appellant, and HOTEL, RESTAURANT AND CAFETERIA EMPLOYEES ORGANIZATION COMMITTEE, Intervenor, Respondent. (Appeal No. 2.)

First Department, May 19, 1939.

*Edward J. Chapman* of counsel [*Harry Rodwin* with him on the brief, attorney], for the appellant.

*Ralph T. Seward* of counsel [*Henry A. Silver* and *Harold Dublirer* with him on the brief], for the respondent New York State Labor Relations Board.

*Joseph D. Drazen* of counsel [*Lewis H. Ullman* with him on the brief; *Drazen & Drazen*, attorneys], for the intervenor-respondent.

GLENNON, J. This controversy arose under the New York State Labor Relations Act (Labor Law, art. 20, added by Laws of 1937, chap. 443). The appellant Stork Restaurant, Inc., discharged about twenty-seven of its employees in or about the early part of September, 1937. This group included nine waiters whose reinstatement has been directed by the New York State Labor Relations Board. These men made application for membership in the Hotel, Restaurant and Cafeteria Employees Organization Committee between September 3 and September 5, 1937.

The New York State Labor Relations Board, at the behest of the union, on October 16, 1937, served a complaint wherein it was charged that Stork Restaurant, Inc., had engaged in unfair labor practices in violation of subdivisions 1–5, 9 and 10 of section 704 of the State Labor Relations Act by (1) discharging and refusing to reinstate a number of its employees (waiters) because of their union activities; (2) spying upon its employees and keeping them under surveillance for the purpose of discovering union activities; (3) participating in, interfering with and dominating the formation and existence of a " company union," Stork Restaurant Employees Association; (4) maintaining, distributing and circulating a blacklist; (5) threatening, intimidating and coercing its employees with respect to union activities. Stork Restaurant, Inc., in its answer denied its guilt of any and all the charges.

Hearings were begun on October 28, 1937. Testimony was taken and evidence received on fourteen different occasions, the last of which was on February 17, 1938. No trial examiner was appointed. Two members of the Board presided when the first hearing was held. Subsequently, with the exception of one, which was held on December fifteenth, at which the executive secretary presided, either Doctor Boland or Commissioner Herzog conducted the hearings. The third member of the Board, Commissioner Moore, did not appear at any of the hearings, and still the decision and order which was filed by the Board was signed by Mr. Moore and Doctor Boland. It was stated upon the argument that the reason Mr. Herzog did not affix his name was due to the fact that he was on vacation. It was also conceded that none of the Commissioners had read the entire set of minutes which we have been called upon to review in this case. It was stated, however, that the testimony, at least for the most part, had been discussed.

The Board did not render its final decision until October 25, 1938, over eight months after the final hearing was had. It exonerated the Stork Restaurant, Inc., of charge (2), which referred to spying upon the employees, and charge (4), which referred to blacklisting. It found Stork Restaurant, Inc., guilty of discharging and refusing to reinstate nine of the waiters because of their union activities and also participating in, interfering with and dominating the formation and existence of a " company union." The result of the Board's order would make it necessary for the Stork Restaurant, Inc., to reinstate the nine discharged waiters with back pay, a sum which has been estimated by the appellant at the time the appeal was argued to be in excess of $30,000.

It is difficult to understand how the State Labor Relations Board reached the conclusion that the appellant was guilty of the charges

of unfair labor practices and of the initiation or domination of the so-called " company union." The substantial evidence in the record calls for a conclusion which should have resulted in a decision, findings and an order entirely exonerating the appellant of all charges.

According to the testimony of the discharged employees the average weekly earnings of each was about fifty dollars. In addition thereto meals were furnished by the appellant to them. With the exception of one or two, they conceded that they were satisfied with the working conditions. Apparently Billingsley, who may be styled as the boss, had treated them well. In fact, the record indicates that Billingsley was too lenient and made the mistake of not discharging this particular group long before the early part of September, 1937.

It seems to be the practice in the conduct of this line of business to replace unsatisfactory employees on or around Labor Day of each year. If a new headwaiter is employed, he may, if the circumstances warrant, bring in replacements for those whose services have proved unsatisfactory. In fact, these discharged employees, with the exception of one or two, were brought into this restaurant by a man named Pierre in September, 1936. Everything went along smoothly until Pierre was discharged in November of that year. Later, this group, headed by one Rebuffi, became inefficient and insulting to customers as well as to their immediate superiors. Some padded customers' checks, while others complained of the size of the tips. By way of illustration, one customer testified that in the case of Grua, one of the discharged employees, he had made a complaint because at a birthday dinner for a party of six, after he had given a captain seven dollars and his waiter ten dollars as tips, he was asked by the waiter to give additional money for the purpose of taking care of his partner. The practice, it seems, in restaurants of this type, is to have two waiters work as partners. Naturally, the customer complained to the manager about the conduct of the waiter.

The testimony indicates that a rumor had spread among the employees during the summer months that there were to be changes in personnel after Labor Day. With the exception of one, who admitted that he had heard the rumor, the eight others who were discharged denied knowledge of it. It is quite apparent that it was almost common gossip among the employees that a captain named Mario, who had worked at the restaurant during the winter and spring season, was about to bring some waiters down from Saratoga, where he had been working during the summer. In fact, one Julius Press, who was an assistant in charge of the union

about the time these men filed applications for membership, admitted that he had heard a report to that effect in June or the early part of July.

Press testified that Rebuffi and Randerath signed their application cards, which bear date September 3, 1937, in his presence at the office of the union. He said these two men did not tell him at first what they wanted other than that they desired to see Gentili. " They were very reluctant to speak to me. They acted like it was a secret or something. After awhile I said, ' It is perfectly all right,' and they signed. Gentili came in and I told him I just signed some of the boys from the Stork Club. He said, ' Take it easy. I will handle this matter.' He said, ' I understand there is a crew coming down from Saratoga, so don't go too hard.' " He further stated in effect that Gentili told him that the crew consisted of " 8, 10 or 12 " new men.

A few days later another waiter who was employed at the restaurant visited union headquarters. " He asked me if he joined the union what protection we could give him, and I said, ' We will give you the protection we give everybody else. Under the Wagner Act, he was entitled to join an organization of his own choosing.' " He admitted that he had made, in substance, the following statement to Hoffman: " You are running to the union when you are threatened. You didn't think about keeping up or cultivating the union as long as everything is smooth. I will have a hard time to get men back to the job. Why don't you come in before you get in trouble? After you are fired or running danger of being fired, you are running to the union." It should be noted in passing that this witness was not cross-examined by the attorney who represented the union.

It was quite apparent that the only purpose that the nine men had in joining the union was to save themselves against discharge which each one knew was about to take place. Bearing in mind that their earnings were exceptionally good and that they were satisfied with their employment, it is difficult to understand any other motive which could have actuated them to file their applications for membership in the union immediately before Labor Day, 1937. In fact, it is clear from the testimony of Gentili, its organizer, that the representatives of the union did not make the first approach to these nine waiters.

It might be well at this point to review briefly some of the acts which would tend to show that these men were discharged because of infractions of the rules and misconduct rather than their so-called union activities. Rebuffi appears to have been a man of temper, as was evidenced by the fact that, without provocation, he stabbed

a small bus boy in the leg with a penknife. He had no respect for the orders which he received from his superiors. He padded the customers' checks, and, if the tips did not satisfy him, he insulted the customers. Rebuffi, the evidence indicates quite clearly, was the head of the " Pierre " clique, and it was he who, according to the testimony of Armour, attempted to extort $2,000 from Billingsley after his discharge for the purpose of straightening " the whole thing out." A customer, who was called, told of an incident of how, about the middle of August, he and his wife had visited the restaurant. Rebuffi waited on them. He said, " I don't know whether the waiter was drunk or arrogant. Things were wrong in coming to the table." The check was about twelve dollars. The tip of about one dollar was handed to Rebuffi. He dropped it to the floor. The customer became annoyed after Rebuffi said, " Is that all? " He asked for Billingsley. Rebuffi replied, " I don't know where he is. Get him yourself." Just before Labor Day the customer visited the Stork Restaurant, Inc., and, being questioned by Armour as to why he had not been in for the two or three weeks prior thereto, he told him what had happened and " that the treatment I received I didn't intend to come in there any more." The customer pointed out Rebuffi, with the result that Rebuffi was discharged that night, not for his union activities, but for conduct toward a customer which fully justified his discharge.

Randerath, on the night of September third, the very day he filed his application for membership in the union, on being called to task by one Lucas, a captain, for his method of serving customers, said, referring to the captain, " Those lousy Greeks, what they know about service." The captain reported the insubordination to the headwaiter and Randerath was discharged. On a prior occasion Lucas saw Randerath take a bottle of beer from the dining room into the pantry and drink it. Since that was a violation of the house rules, he notified Harris, the headwaiter.

Franchetti insulted the customers, according to the testimony, and was in the habit of drinking on the premises during working hours and was constantly in trouble. He was exceedingly annoying to the chef, careless about his personal appearance and had a great deal of difficulty about his checks. According to him he was discharged by Billingsley for the following reason: " I took two crepe suzettes and two coffees. I said to the checker, ' Table No. 3.' The checker said, ' What about the price of this luncheon? ' Mr. Billingsley was standing right at the checker's desk. I went over to the checker and I said, ' Mr. Billingsley is here now.' * * * I said, ' Mr. Billingsley would you like to okay it? ' Mr. Billingsley

got awfully excited and said, ' What is the trouble with the check? You steal my house. Get your coat. Get out of here.' "

Tomisini was of the quarrelsome type, ever ready to pick a quarrel and in the habit of insulting the customers if the size of the tips did not meet with his approval. Consiglio was never on time for work and frequently left without reporting, although there was a house rule to that effect. He also drank liquor on the premises during working hours, contrary to the rules. On the day of his discharge a customer, who was accompanied by friends, complained to Coulis, a headwaiter, that while he had ordered a large steak he was served with only a couple of slices. He was informed by the waiter upon his request for extra steak that there was no more. Coulis went out to the pantry and found Consiglio dishing the steak out of a pan onto a plate. When asked why he had not served the remaining steak to the customer he replied that the party did not want any more.

Pampanini was described by a fellow waiter as follows: " He always acted like a crazy man. He was always excited. I don't believe that boy was right in his mind. Any little thing he was jumpy, acted nervous. Go from one room to the other. Walked around. I think he was crazy. I really believe it." Another waiter, by way of corroboration, gave testimony as to the happening of an incident in the kitchen which indicated that the description of Pampanini, as quoted, fairly summarized the character of that employee. One of the bartenders said he " reported Pampanini for coming to the bar and putting wrong table numbers on the slips, not ordering drinks as the customers ordered them, which caused delay on the bar service."

Neusser was discovered by the watchman taking a chicken away from the premises. He was compelled to return it. His explanation in effect was that he was simply taking some scraps for his dog. He requested the man in charge of the storeroom not to tell the boss, since " I don't want to lose my job."

Varisco was discharged on September twenty-third. He had the habit of drinking liquor upon the premises. He also was charged with padding checks.

Caligaris was discharged on September twenty-third. There were numerous complaints from the customers that he had " bad breath." In addition thereto, according to the evidence, " he wasn't a finished waiter, either that or he didn't try."

Grua is the waiter who called upon the customer to give an additional tip for his partner. He was discharged, but was reinstated on September thirteenth. He continued to work until September thirtieth. He was again dropped for his failure to report for a period of at least five days.

There was no substantial evidence in the record to indicate that Stork Restaurant, Inc., had anything to do with the formation of the company union. The substantial evidence indicates that it was the employees, rather than the management, who conceived the idea of forming a company union. In or about July, 1937, certain of the employees discussed the matter. The prime movers were a headwaiter named Harris and a captain named Lopez. According to the testimony of Lopez, by the end of August almost sixty per cent of the employees had been consulted. At that time he went on his vacation and did not return until about September seventh. Upon his return it was decided to retain a lawyer to take care of the necessary legal steps in the formation of a company union. Mr. Leo Rosett was engaged to do the work. The management of the restaurant had nothing to do with the formation of this union and the legal fees were paid by the employees.

We do not believe that there is substantial evidence in the record to support the findings, decision, conclusions and order of the State Labor Relations Board. In *National Labor Relations Board* v. *Columbian Enameling and Stamping Co.* (306 U. S. 292) Mr. Justice STONE said in part: " Section 10 (e) of the Act provides: ' * * * The findings of the Board as to the facts, if supported by evidence, shall be conclusive.' But as has often been pointed out, this, as in the case of other findings by administrative bodies, means evidence which is substantial, that is, affording a substantial basis of fact from which the fact in issue can be reasonably inferred. *Washington, V. & M. Coach Co.* v. *National Labor Relations Board,* 301 U. S. 142; *Consolidated Edison Co.* v. *National Labor Relations Board,* 305 U. S. 197; *Appalachian Electric Power Co.* v. *National Labor Relations Board,* 93 F. [2d] 985, 989; *National Labor Relations Board* v. *Thompson Products, Inc.,* 97 F. [2d] 13; *Ballston-Stillwater Knitting Co.* v. *National Labor Relations Board,* 98 F. [2d] 758, 764. Substantial evidence is more than a scintilla, and must do more than create a suspicion of the existence of the fact to be established. ' It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion ' (*Consolidated Edison Co.* v. *National Labor Relations Board, supra,* p. 229), and it must be enough to justify, if the trial were to a jury, a refusal to direct a verdict when the conclusion sought to be drawn from it is one of fact for the jury. See *Baltimore & Ohio R. Co.* v. *Groeger,* 266 U. S. 521, 524; *Gunning* v. *Cooley,* 281 U. S. 90, 94; *Appalachian Electric Power Co.* v. *National Labor Relations Board, supra,* 989."

For the reasons assigned the orders entered at Special Term should be reversed, with costs, the motion of Stork Restaurant, Inc., to

vacate the decision, findings of fact, conclusions of law and order of New York State Labor Relations Board granted and the application of New York State Labor Relations Board to enforce its decision, dated October 25, 1938, denied.

MARTIN, P. J., and COHN, J., concur; CALLAHAN, J., dissents in a memorandum in which UNTERMYER, J., concurs.

CALLAHAN, J. (dissenting). I dissent. There was considerable proof before the Board showing (1) that the discharge of the waiters was for union activities, and (2) the fact of appellant's participation in the formation of the so-called " company union." This proof afforded a substantial basis for the Board's findings, and, under the circumstances, such findings should not be disturbed. The orders appealed from should be affirmed.

UNTERMYER, J., concurs.

Orders reversed, with costs. The motion of Stork Restaurant, Inc., to vacate the decision, findings of fact, conclusions of law and order of New York State Labor Relations Board granted and the application of New York State Labor Relations Board to enforce its decision, dated October 25, 1938, denied. Settle order on notice.