In the Matter of Stork Restaurant, Inc., Respondent, against John P. Boland et al., Constituting the New York State Labor Relations Board, Appellants.

In the Matter of New York State Labor Relations Board, Appellant, against Stork Restaurant, Inc., Respondent.

Hotel, Restaurant and Cafeteria Employees Organization Committee, Intervener, Appellant.

Argued November 16, 1939; reargued January 23, 1940; decided March 5, 1940.

*Ralph T. Seward, Henry A. Silver, Eugene Cotton* and *Daniel Kornblum* for New York State Labor Relations Board, appellant. The Board's findings are fully supported by substantial evidence. Courts may not substitute their judgment for that of the Board and the Board's findings of fact, if supported by evidence, are conclusive. (*Metropolitan Life Ins. Co.* v. *New York State Labor Relations Board*, 280 N. Y. 194; *Washington, Virginia & Maryland Coach Co.* v. *National Labor Relations Board*, 301 U. S. 142; *Consolidated Edison Co.* v. *National Labor Relations Board*, 95 Fed. Rep. [2d] 390; 305 U. S. 197; *Federal Trade Comm.* v. *Pacific States Paper Trade Assn.*, 273 U. S. 52; *Florida* v. *United States*, 292 U. S. 1; *Matter of Chetney* v. *Manning Co.*, 273 N. Y. 82; *National Labor Relations Board* v. *Kentucky Fire Brick Co.*, 99 Fed. Rep. [2d] 89; *National Labor Relations Board* v. *Nebel Knitting Co.*, 103 Fed. Rep. [2d] 594; *National Labor Relations Board* v. *Wallace Mfg. Co.*, 95 Fed. Rep. [2d] 818; *Agwilines, Inc.*, v. *National Labor Relations Board*, 87 Fed. Rep. [2d] 146; *United States* v. *Louisville & Nashville R. R. Co.*, 235 U. S. 314; *Federal Trade Comm.* v. *Algoma Lumber Co.*, 291 U. S. 67.)

*Joseph D. Drazen* and *Jerome Drazen* for intervener, appellant. There is substantial evidence to support and sustain the findings made by the Board. (*National Labor Relations Board* v. *Fansteel Metallurgical Corp.*, 306 U. S. 240; *Davega City Radio, Inc.*, v. *New York State Labor Relations Board*, 281 N. Y. 13; *Washington, Virginia &*

*Maryland Coach Co.* v. *National Labor Relations Board,* 301 U. S. 142; *National Labor Relations Board* v. *Pennsylvania Greyhound Lines, Inc.,* 303 U. S. 261; *Consolidated Edison Co.* v. *National Labor Relations Board,* 305 U. S. 197; *Metropolitan Life Ins. Co.* v. *New York State Labor Relations Board,* 280 N. Y. 194; *National Labor Relations Board* v. *Nebel Knitting Co.,* 103 Fed. Rep. [2d] 594; *Matter of Collier Service Corp.* v. *Boland,* 167 Misc. Rep. 709; *Matter of New York State Labor Relations Board* v. *Interborough News Co.,* 170 Misc. Rep. 347.) The Board's order, supported by substantial evidence, is proper in all respects. (*National Labor Relations Board* v. *Jones & Laughlin Steel Corp.,* 301 U. S. 1; *National Labor Relations Board* v. *Pennsylvania Greyhound Lines, Inc.,* 303 U. S. 261.)

*Edward J. Chapman* and *Harry Rodwin* for respondent. The record discloses no substantial evidence to support the decision and findings made by the Board and the Appellate Division, therefore, properly vacated its order. (*Matter of International Ry. Co.* v. *Boland,* 169 Misc. Rep. 926; *National Labor Relations Board* v. *Columbian Enameling & Stamping Co.,* 306 U. S. 292; *National Labor Relations Board* v. *Sands Mfg. Co.,* 306 U. S. 332; *National Labor Relations Board* v. *Jones & Laughlin Steel Corp.,* 301 U. S. 1; *Associated Press* v. *National Labor Relations Board,* 301 U. S. 103; *National Labor Relations Board* v. *Union Pacific Stages, Inc.,* 99 Fed. Rep. [2d] 153; *Ballston-Stillwater Knitting Co.* v. *National Labor Relations Board,* 98 Fed. Rep. [2d] 758; *National Labor Relations Board* v. *Fansteel Metallurgical Corp.,* 306 U. S. 240; *Ford Motor Co.* v. *National Labor Relations Board,* 305 U. S. 364.)

LEHMAN, Ch. J. In the summer of 1937 the Hotel, Restaurant and Cafeteria Employees Organization Committee (hereinafter referred to as the union) was established jointly by twelve local unions, affiliated with the American Federation of Labor. Its purpose was to conduct a campaign to organize workers in the hotel and restaurant industry in New York city. Shortly before Labor Day some of the

waiters employed by Stork Restaurant, Inc., which conducts a restaurant widely known as the Stork Club, joined the union. Within three weeks they and other waiters who had joined the union were discharged and a few days thereafter the employees of the Stork Club had formed an organization which they called the Stork Restaurant Employees Association (hereinafter referred to as the association). Promptly after its organization the association presented a demand for a wage increase and for improvement in some respects of working conditions. These were immediately granted by the restaurant, which, at the same time, recognized the association as the representative of the employees for purposes of collective bargaining.

The Legislature, by chapter 443 of the Laws of 1937, added to the Labor Law (Cons. Laws, ch. 31) article 20, entitled, New York State Labor Relations Act. It provides that " employees shall have the right of self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in concerted activities, for the purpose of collective bargaining or other mutual aid or protection, free from interference, restraint, or coercion of employers." (§ 703.) To protect these rights guaranteed by section 703, the same article of the Labor Law creates a Labor Board, empowered and directed, as provided in the statute, " to prevent any employer from engaging in any unfair labor practice." (§ 706.) The union has, in this case, charged that the Stork Restaurant, Inc., has engaged in unfair labor practices which interfere with the exercise by its employees of the rights guaranteed by the Labor Law.

The acts which constitute " unfair labor practices " in which employers may not engage, and which the Board is empowered to prevent, are enumerated in section 704. So far as relevant to the charges made by the union against Stork Restaurant, Inc., that section provides:

" It shall be an unfair labor practice for an employer:

" 1. To spy upon or keep under surveillance, whether directly or through agents or any other person, any activities

of employees or their representatives in the exercise of the rights guaranteed by section seven hundred three.

" 2. To prepare, maintain, distribute or circulate any blacklist of individuals for the purpose of preventing any of such individuals from obtaining or retaining employment because of the exercise by such individuals of any of the rights guaranteed by section seven hundred three.

" 3. To dominate or interfere with the formation, existence, or administration of any employee organization or association, agency or plan which exists in whole or in part for the purpose of dealing with employers concerning terms or conditions of employment, labor disputes or grievances, or to contribute financial or other support to any such organization, by any means, including but not limited to the following: (a) by participating or assisting in, supervising, controlling or dominating (1) the initiation or creation of any such employee organization or association, agency, or plan, or (2) the meetings, management, operation, elections, formulation or amendment of constitution, rules or policies, of any such employee organization or association, agency or plan; (b) by urging the employees to join any such employee organization or association, agency or plan for the purpose of encouraging membership in the same; (c) by compensating any employee or individual for services performed in behalf of any such employee organization or association, agency or plan, or by donating free services, equipment, materials, office or meeting space or anything else of value for the use of any such employee organization or association, agency or plan; provided that, an employer shall not be prohibited from permitting employees to confer with him during working hours without loss of time or pay.

" 4. To require an employee or one seeking employment, as a condition of employment, to join any company union or to refrain from forming, or joining or assisting a labor organization of his own choosing.

" 5. To encourage membership in any company union or discourage membership in any labor organization, by discrimination in regard to hire or tenure or in any term or

condition of employment: Provided that nothing in this article shall preclude an employer from making an agreement with a labor organization requiring as a condition of employment membership therein, if such labor organization is the representative of employees as provided in section seven hundred five. * * *

" 9. To distribute or circulate any blacklist of individuals exercising any right created or confirmed by this article or of members of a labor organization, or to inform any person of the exercise by any individual of such right, or of the membership of any individual in a labor organization for the purpose of preventing individuals so blacklisted or so named from obtaining or retaining employment.

" 10. To do any acts, other than those already enumerated in this section, which interfere with, restrain or coerce employees in the exercise of the rights guaranteed by section seven hundred three."

" Whenever a charge has been made that any employer has engaged in or is engaging in any unfair labor practice, the board shall have power to issue and cause to be served upon such employer a complaint stating the charges * * *." (§ 706.) The complaint which the Board issued and caused to be served upon Stork Restaurant, Inc., as thereafter amended, stated in substance that the employer had engaged in the unfair labor practices enumerated in section 704, by discharging eleven waiters, named in the complaint, because of their union activities; by spying and keeping its employees under surveillance; by forming and dominating a company union, known as the Stork Restaurant Employees Association, and by otherwise interfering with, restraining and coercing its employees in the exercise of the rights guaranteed them by section 703 of the Labor Law.

Numerous hearings on the charges stated in the complaint were held between October 28, 1937, and February 17, 1938, before different members of the Board and one hearing before the Secretary of the Board, who had been designated as Trial Examiner for that hearing. The employer had full opportunity to be heard, to examine and cross-examine

witnesses and to introduce evidence. On June 10, 1938, the Board prepared proposed findings of fact and conclusions of law. Opportunity was offered to all parties to file exceptions to the proposed findings and conclusions and to argue the questions involved. The employer filed exceptions on June 17, 1938, but wrote that it would dispense with argument as its position was " adequately presented in the Brief and Exceptions heretofore filed to which the Board's attention is again respectfully directed." On October 25, 1938, the Board filed a " Decision, Findings of Fact and Order of the Board," signed by two of its members. In that decision the Board, after a detailed review of the evidence, made fifty-nine formal findings of fact and eleven conclusions and it based on those findings and conclusions an order which directed the employer to " cease and desist " from certain acts there specified and also to take other specified " affirmative action which the Board finds will effectuate the policies of the Act."

It is not disputed that eleven waiters named in the complaint, who were members of the union, were discharged in September. The Board found that ten of the eleven were discharged because they joined the union, assisted the union or were suspected of being members of the union. It found that one of the eleven waiters was discharged for other cause. The Board also found that another one of the eleven waiters, though discharged because of membership in the union, was thereafter reinstated; that he then became ill and that the evidence does not show that he " was replaced or refused reinstatement after his illness because of his membership in or assistance of the union." The employer was commanded to offer to the other nine discharged waiters immediate and full reinstatement to the positions they had previously held and was commanded to " make whole " these waiters " for any loss of pay they have suffered by reason of their having been discharged, by payment to them of a sum of money equivalent to that which they would normally have earned from the date of their discharge to the date of such offer of reinstatement, less the amount earned by each of them during such period."

If, as the Board found, ten waiters who had joined the union were discharged for that reason, hostility of the management toward the union might perhaps be, also, an inducing cause for the organization of the Stork Restaurant Employees Association in the same month. The Board found that the restaurant's " supervisory employees * * * initiated and brought about the formation " of the association and that the association " was intended to prevent further attempts on the part of the Union to organize the employees of the Stork Club, and was designed to create the impression among the employees * * * that they were represented thereby for the purposes of collective bargaining and the discussion of grievances, terms or conditions of employment." The Board further found that " since its formation, the Association has been dominated and controlled by the respondent [Stork Restaurant, Inc.] acting through trusted supervisory employees." The Board found also that the restaurant did not circulate a blacklist of these employees who had joined the union and that it " has not spied upon or kept under surveillance the activities engaged in by its employees in the exercise of their right to join or assist a labor organization of their own choosing."

Other findings of the Board amplify or support the findings which we have quoted or set forth in summary. The Board based upon these findings conclusions that " Stork Restaurant Employees Association is a company union within the meaning of section 701, subdivision 6, of the act." That Stork Restaurant, Inc., " by participating in, dominating and interfering with the formation, existence and administration of the Stork Restaurant Employees Association and by urging, through its supervisory employees, that its employees join the said Association, has engaged in and is engaging in unfair labor practices within the meaning of section 704, subdivisions 3 and 10, of the Act." That the restaurant has discriminated in regard to the hire and tenure of employment of nine of its waiters " thereby discouraging membership in the Union and encouraging membership in the Association, and has thereby engaged in and

is engaging in unfair labor practices within the meaning of section 704, subdivision 5, of the Act." That the restaurant "by interfering, restraining and coercing its employees in the exercise of the rights guaranteed them by section 703 of the Act, has engaged in and is engaging in unfair labor practices within the meaning of section 704, subdivision 10, of the Act," and that by such acts the restaurant "has required its employees, as a condition of employment, to join the Association, and to refrain from joining or assisting the Union, a labor organization of their own choosing, within the meaning of section 704, subdivision 4, of the Act." In addition to its commands that the restaurant reinstate nine waiters and make them whole for loss of wages the Board commanded that the restaurant "withdraw all recognition from the Stork Restaurant Employees Association as the representative of its employees for the purpose of dealing with its employees concerning grievances, terms or conditions of employment, and completely disestablish the Stork Restaurant Employees Association as such representative," and give appropriate notice that, among other things, "all recognition is withdrawn from the Stork Restaurant Employees Association and that the said Association is disestablished as the exclusive representative of its employees for the purpose of collective bargaining," and "that the employees of the respondent are free to join, or assist any labor organization of their own choosing."

When, after a hearing, the Labor Board has determined that an employer has engaged in or is engaging in any unfair labor practice, it must state its findings of fact and must issue an order requiring the employer " to cease and desist from such unfair labor practice, and to take such further affirmative or other action as will effectuate the policies of this article, including, but not limited to (a) withdrawal of recognition from and refraining from bargaining collectively with any employee organization or association, agency or plan defined in this article as a company union or established, maintained or assisted by any action defined in this article as an unfair labor practice; (b) awarding of back pay; (c)

reinstatement with or without back pay of any employee discriminated against in violation of section seven hundred four * * *." (§ 706, subd. 3.)

When an order of the Board is challenged, the Board may petition the Supreme Court " for the enforcement of such order " or " any person aggrieved by a final order of the board * * * may obtain a review of such order in the supreme court * * * by filing in such court a written petition praying that the order of the board be modified or set aside." (§ 707.) The Stork Restaurant, Inc., filed such a petition. The same section of the statute which provides for a judicial review of orders of the Board also defines the scope of the review, " No objection that has not been urged before the board * * * shall be considered by the court, unless the failure or neglect to urge such objection shall be excused because of extraordinary circumstances. *The findings of the board as to the facts, if supported by evidence, shall be conclusive.*" (Italics, of course are ours.) The Supreme Court at Special Term held that the findings were supported by the evidence and refused to set aside or modify the order. The Appellate Division, by a closely divided court, reversed the order of Special Term and set aside the order of the Board.

The only substantial question presented by this appeal is whether the findings of the Board are supported by the evidence. The conclusions of the Board are firmly based upon the findings, if there is evidence to sustain the findings; and the orders of the Board to the employer are authorized by the statute and do not exceed the powers of the Board if the findings and conclusions of the Board are sound. The respondent does not seriously contend otherwise. True, it has argued in this court that the proceedings of the Board do not accord with the requirements of due process of law but the argument is based largely upon objections not raised before the Labor Board and not raised or considered in the court below. Those objections which we are free to consider are, we think, without substance and the respondent places small reliance upon them. We examine the record

to determine whether, upon the evidence presented, the Board might reasonably find that nine waiters who joined the union were discharged, as the union claims, because of union membership and as part of a definite plan to prevent the employees of the Stork Club from joining the union of their choice, or whether the Board was bound to find, as the employer claims, that they were discharged for incompetence or misconduct and because of complaints received by the management of the club.

Where there is conflict in the testimony produced before the Board, where reasonable men might differ as to whether the testimony of one witness should be accepted or the testimony of another witness be rejected, where from the evidence either of two conflicting inferences may be drawn, the duty of weighing the evidence and making the choice rests solely upon the Board. The courts may not weigh the evidence or reject the choice made by the Board where the evidence is conflicting and room for choice exists. (Cf. *National Labor Relations Bd.* v. *Waterman S. S. Co.*, 309 U. S. 206, decided unanimously by United States Supreme Court, Feb. 12, 1940.) We attempt, in this opinion, to state and analyze the testimony only so far as necessary to determine whether there is evidence which might reasonably be believed and which, if believed, adequately supports the findings of the Board.

Facts which are undisputed or established by testimony which cannot reasonably be rejected form the background against which the controversy must be viewed. The Stork Club is a restaurant with a well-established reputation. It seeks to maintain standards of service as high as any restaurant in New York and to employ only trained, competent waiters. The waiters who, it is said, were discharged because they joined the union, had been employed during the previous year. Many of them had been brought to the restaurant in September, 1936, by a headwaiter who was employed by the Stork Club after the close of the summer season at Saratoga. It was not unusual for the Stork Club to hire a new headwaiter or a new captain after the

close of the season at Saratoga and, with the new headwaiter or captain, to hire also a number of new waiters. In August, 1937, the waiters at the Stork Club were greatly disturbed by well-defined rumors that a new headwaiter with a crew of new waiters was coming from Saratoga and that a wholesale discharge of old waiters was impending. While these rumors were current some of the old waiters went to the headquarters of the union and joined the union. Some waiters had, indeed, several months before discussed with the organizer of the union plans for the organization or unionization of the Stork Club. Membership in the union was followed by prompt discharge. On September 3, 1937, four waiters joined the union and two of them distributed application cards among other waiters in the dining room. One of the waiters who joined the union was discharged the same night and another was discharged two days thereafter. On September 4th five more waiters joined the union and three more joined a few days thereafter. One waiter had been a member of the union when engaged and remained a member of the union. On or before September 23rd all these thirteen workers who were members of the union had been discharged, though some of them were reinstated at least temporarily and two of those reinstated were still in the employ of the restaurant at the time that charges were made and were heard by the Board. The coincidence in all these cases of membership in the union followed promptly by discharge from employment would certainly justify at least a very strong suspicion that discharge followed membership as result follows cause. Unless other satisfactory explanation of the discharge is supplied, justified suspicion becomes a reasonable — indeed perhaps a necessary — inference when membership in the union is related to discharge by other circumstances, proven in this case beyond possibility of challenge.

On September 4th, the day after two waiters distributed, in the restaurant, application cards for membership in the union, the manager of the restaurant, who was in complete charge whenever the proprietor was absent, called each

waiter to his office, and had a private talk with him. In regard to the details of what was there said, there is some conflict between the testimony of some of the waiters and the testimony of the manager. The difference is, perhaps, not very serious. There is no dispute that the manager referred to rumors of impending discharge of waiters and that he told each waiter that he would not lose his job if he did his work properly and that no waiters need join the union to hold their jobs. The testimony of waiters who were discharged, corroborated by at least one waiter produced as a witness by the restaurant and who was not discharged, shows that at the same time the manager asked each waiter whether he had joined the union.

The proprietor, who was away over the Labor Day weekend when these talks with the manager were held, returned on September 7th. On the same day he called the waiters together and made a little speech to them. He was not a witness at the hearings held by the Board but waiters who heard the speech were produced as witnesses by each side and there is substantial agreement as to what was said. He told the waiters that he had heard that rumors were current that waiters would lose their jobs unless they joined a union and that he wanted to tell them that this was not true; that they were free to join a decent union or to join none but that he would have nothing to do with the " racketeering " union controlled by " Dutch Schultz," who had dominated a waiters' union with which the restaurant had had a controversy several years before; and that he would rather close the place than have anything to do with that union. Several of the discharged waiters testified that on the same day the proprietor questioned them not only about their own union affiliations but also as to the union affiliations of other waiters. One of these witnesses even testified that he said, " You know union men only a bunch of racketeers. I wouldn't have nobody employed in my place here if I know they are union men " (*sic*).

The discharge of several waiters followed the next day; but two days thereafter the discharged waiters were told by

the manager (and here we quote from the manager's testimony), " I can't absolutely promise you this, first of all I want you boys to know I am not talking to you as a group, I am talking to you individually. I am quite sure if you will sit down and write a letter of apology for the different things that you have done and we have had complaints on that Mr. Billingsley will forgive you and give you your jobs back." Several waiters testified also that when they spoke to Mr. Billingsley, the proprietor, he had in his hand a list of waiters, suspected of being members of the union, and that he questioned them about others whose names appeared on the list.

The New York State Labor Relations Act leaves an employer free to employ or to discharge as he sees fit for good reason or for poor reason or for no reason at all — subject only to one limitation, that he may not " require an employee or one seeking employment, as a condition of employment, to join any company union or to refrain from forming, or joining or assisting a labor organization of his own choosing." . Nor may an employer " encourage membership in any company union or discourage membership in any labor organization, by discrimination in regard to hire or tenure or in any term or condition of employment." A member of a union has under the statute no security of tenure, which the Board may protect, greater than other employees who are not members. The policy of the statute is that employees shall be free to join a union of their choice or, if they prefer, to join no union. The statute confers upon the Board power to prevent discrimination by the employer which interferes with such freedom of his employees. The Board may not command an employer to retain in his employ a discharged employee who is a member of the union unless it appears that the discharge was influenced by the employee's membership in the union and was calculated to interfere with the freedom of choice guaranteed by the act to all employees. Here, the employer claims that the members of the union were discharged because of incompetence and the employer has produced

evidence to show that many complaints had been made against the discharged employees and that before they joined the union their names had been placed upon a list of employees who were to be replaced after Labor Day. The Appellate Division has said that " the substantial evidence in the record calls for a conclusion which should have resulted in a decision, findings and an order entirely exonerating the appellant [Stork Restaurant] of all charges." (257 App. Div. 74, 76.) Assuming here that Stork Restaurant has produced substantial evidence which might have sustained findings and conclusions in its favor, the question still remains whether the Board might reasonably reject or disregard that evidence and base findings and conclusions against the restaurant on other evidence.

In considering that question we do not ignore the fact that an employer, exercising his right to discharge unsatisfactory employees, has not under the statute the burden of justifying the discharge. The burden of proving a charge against an employer of " unfair labor practices " rests upon those making the charge. The evidence to prove the charge may, of course, be circumstantial, but it must be sufficient to permit a reasonable inference of violation, by the employer, of rights guaranteed by the statute. The testimony which we have stated in brief summary shows beyond possibility of dispute that in the month of September twelve waiters joined the union. In the same month they and one waiter who had long been a member of the union were discharged. During the days when these waiters were joining the union and were being discharged, the manager and the proprietor of the restaurant were warning the waiters against " racketeering unions," assuring the waiters that they need join no union to save their jobs and inquiring of individual waiters whether they had joined a union. While the management of this restaurant was inquiring about the union affiliations of the waiters in its employ and was discharging waiters who were members of the union, other employees were forming the association confined to employees of the Stork Club. The head waiter of the

restaurant and the head captain — occupying important supervisory positions - took an active part in the formation of the association. Indeed, respondent in its brief states that apparently these two " were the first to formulate the idea and were the first to take active steps to bring the Association into existence." They took the lead in retaining a lawyer to take care of the legal formalities. The organization meeting was held in the captain's dining room in the Stork Club, while the manager of the club was in the building and the restaurant was open. The vote to form the organization was taken by a show of hands, though there is testimony that one of the waiters asked that the voting should be secret. The attorney who had been retained was present at the meeting. He is active in the labor movement and represents other labor organizations and there is no reason to doubt that he represented in good faith the interests of the members of the association who were his clients and not the interests of the restaurant management. He was, however, a frequent customer of the restaurant and had previously acted as attorney for the proprietor in a law suit. A week later an election was held in the same room in the Stork Club. The head captain was elected president of the association and in behalf of the employees he presented to the proprietor demands for increase of wages and for improvement in some particulars in working conditions. Within twenty-four hours the proprietor accepted all the demands of the association without any discussion and agreed to recognize the association as the representative of the employees.

We need not extend this opinion by reference here to other testimony — much of it not challenged — which lends additional support to the findings and conclusions of the Board. The testimony to which we have already referred briefly is, it is plain, cogent evidence which might reasonably induce and perhaps even compel the Labor Board to draw the inference that the Stork Club had engaged in unfair labor practices, unless that evidence is rebutted by the testimony produced by the restaurant and relied

upon by a majority of the judges in the Appellate Division in setting aside the order of the Board.

Many witnesses testified that the discharged waiters were incompetent, insolent, unruly and dishonest, and that for months before their discharge the management had received many complaints about their conduct until the patience of the management was exhausted. They were retained until September, it is said, only because it is the practice of the Stork Club to replace unsatisfactory employees after the close of the Saratoga season. There is testimony that even before they joined the union, their names were, as we have already said, placed upon a list of employees who were to be discharged and the list so prepared was introduced and admitted in evidence. Testimony was produced also to show that the employees of the Stork Club organized the association without suggestion from the management and even without the knowledge of the management; that the management did not dominate or interfere with the administration of the association and that the management had recognized the association and granted its demands only because the association had been organized by the employees as their chosen representative for collective bargaining. We are told that, in the light of this testimony, the only reasonable inference is that the employees were discharged because of complaints against them. Suspicion or knowledge that their discharge was impending induced them, it is argued, to join the union; the fact that they had joined the union neither induced nor averted the discharge.

Judicial review of determinations of an adminsitrative board is often limited, as it has been limited in the New York State Labor Relations Act, by a statutory provision to the effect that " the findings of the board as to the facts, if supported by evidence, shall be conclusive." (§ 707, subd. 2.) A finding is supported by the evidence only when the evidence is so substantial that from it an inference of the existence of the fact found may be drawn reasonably. A mere scintilla of evidence sufficient to justify a suspicion is not sufficient to support a finding upon which legal rights and

obligations are based. That requires " such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." (*Consolidated Edison Co.* v. *National Labor Relations Board*, 305 U. S. 197, 229.) The same test is applied in trials before a court and jury. Evidence which is sufficient to require the court to submit a question of fact to a jury is sufficient to support a finding by the administrative board. (Cf. *National Labor Relations Board* v. *Columbian E. & S. Co.*, 306 U. S. 292.)

There is often greater difficulty in applying the test than in formulating it. The evidence produced by one party must be considered in connection with the evidence produced by the other parties. Evidence which unexplained might be conclusive may lose all probative force when supplemented and explained by other testimony. The Board must consider and sift all the evidence — accepting the true and rejecting the false — and must base inferences on what it has accepted as true. Choice lies with the Board and its finding is supported by the evidence and is conclusive where others might reasonably make the same choice. (Cf. *Matter of Metropolitan Life Ins. Co.* v. *N. Y. State Labor Relations Board*, 280 N. Y. 194.)

The Board has rejected the testimony produced by the Stork Club in its defense. We have stated that testimony only in barest outline. If the court had power to weigh the evidence, the picture should be drawn in greater detail. Few additional details are necessary to show that the Board might reasonably reject the testimony. True, it is in large part not contradicted, but also in large part it could not be contradicted even if untrue; and inherent improbabilities furnish good reason for its rejection.

At the outset, question must arise why men as incompetent and as insolent as the discharged waiters must have been, if the picture painted by the employer be true, should have been retained for many months in a restaurant of established reputation and why, in spite of their shortcomings, the restaurant should have been willing to reinstate them if they would " apologize." Doubt is cast upon

the good faith of the complaints against the discharged waiters by the undisputed fact that after their discharge, others retained in the employ of the restaurant, were directed to try to remember and to write in little black books furnished them for that purpose, every complaint against the discharged waiters which they had heard. The testimony that the list of employees who were to be discharged in September was prepared and handed to the headwaiter before any of the discharged employees joined the union, cannot be contradicted directly but the Board has pointed out good reasons for doubting the accuracy of the testimony. Ground for rejecting the explanation of the discharges, furnished by the Stork Club, might be pointed out in greater detail but the clearest justification for the decision of the Board is that throughout the testimony of the manager of the restaurant, it appears unmistakably that the fact that employees of the Stork Club were joining the union was an important factor in everything done during the month of September. The record considered as a whole clearly supports the inference that the discharge of union waiters and the organization of the association as a company union were part of a single plan. The undisputed facts are consistent with that inference. We do not decide whether they are consistent with any other inference or whether the testimony in favor of the Stork Club is true. We decide only that the decision and order of the Board is sustained in all respects by the evidence.

The order of the Appellate Division should be reversed and that of the Special Term affirmed, with costs in this court and in the Appellate Division.

LOUGHRAN, FINCH, RIPPEY, SEARS, LEWIS and CONWAY, JJ., concur.

Ordered accordingly.