AMALGAMATED TRANSIT UNION, DIVISON 1342, Petitioner, v HAROLD R. NEWMAN et al., Individually and as Chairman and Members of the Public Employment Relations Board of the State of New York, Respondents.

Fourth Department, December 23, 1980

#### APPEARANCES OF COUNSEL

*Barlow, Rosenthal, Siegel, Muenkel & Wolf (Jay N. Rosenthal* of counsel), for petitioner.

*Martin L. Barr (Anthony Cagliostro* of counsel), for respondents.

#### OPINION OF THE COURT

DILLON, P. J.

Counsel for the New York State Public Employment Relations Board (PERB) charged that petitioner "caused, instigated, encouraged, condoned and engaged in a strike" against the Niagara Frontier Transit Metro System, Inc. (NFT Metro) on December 14 and 15, 1978 (see Civil

Service Law, § 210, subd 1). Following a hearing upon which the hearing officer recommended that the charge be dismissed, PERB, rejecting that recommendation, agreed that petitioner had not caused or instigated the strike but determined that the evidence was sufficient to establish that petitioner had "condoned" the strike.

The issue to be resolved is whether PERB's determination, on review of the entire record, is supported by substantial evidence (CPLR 7803, subd 4). The issue is one of law to be decided by the courts *(Matter of Clark v Board of Zoning Appeals of Town of Hempstead*, 301 NY 86, 90-91, cert den 340 US 933). In that regard, we exercise "a genuine judicial function" and are not to "confirm a determination simply because it was made by such an agency" *(300 Gramatan Ave. Assoc. v State Div. of Human Rights*, 45 NY2d 176, 181). The evidence upon which the determination is based must be "[m]arked by its substance"; its substantiality "does not rise from bare surmise, conjecture, speculation or rumor" *(300 Gramatan Ave. Assoc. v State Div. of Human Rights*, supra, p 180). "[S]ubstantial evidence consists of proof within the whole record of such quality and quantity as to generate conviction in and persuade a fair and detached fact finder that, from that proof as a premise, a conclusion or ultimate fact may be extracted reasonably—probatively and logically" *(300 Gramatan Ave. Assoc. v State Div. of Human Rights*, supra, p 181). The agency determination will not be upheld unless the record as a whole provides a rational basis to support the findings of fact upon which it is based *(Matter of Pell v Board of Educ.*, 34 NY2d 222). Application of those principles requires that PERB's determination be annulled.

Initially, it should be observed that in presenting evidence at the hearing, counsel for PERB relied upon a presumption, since judicially disavowed *(Matter of Police Benevolent Assn. of City of Yonkers v New York State Public Employment Relations Bd.*, 51 NY2d 779) that a union has consented to a strike where a vast majority of its members participate in it (see *Matter of Police Benevolent Assn. of City of Yonkers*, 11 PERB 3168 [No. 3104]). He presented only two witnesses; Jack Heinen, in charge of payroll and auditing at NFT Metro, and Roy Klager, NFT Metro's

personnel manager. Neither had any personal knowledge of the conduct or activities of union leaders during the day and a half of the work stoppage.

At the close of the charging parties' evidence, the hearing officer reserved decision on petitioner's motion to dismiss. Thereupon, petitioner produced seven executive board members, including its president, who testified about events preceding the strike and who individually recounted their activities during the course thereof. The inescapable conclusion to be drawn from the evidence thus adduced is that the executive board members, confronted with unauthorized action by the union members, acted responsibly, consistent with their mandate as union leaders, in facilitating prompt termination of the unauthorized strike. Put another way, it is irrefutable that the executive board members made "good faith efforts to terminate the strike" (Civil Service Law, § 210, subd 3, par [e]). Significantly, though concededly not determinative, that view is consistent with the hearing officer's affirmative findings upon which she recommended that the charge be dismissed.

It was conclusively demonstrated at the hearing that petitioner's executive board, prior to the work stoppage, had twice recommended membership approval of tentative collective bargaining agreements with NFT Metro. These recommendations were made at meetings on August 2, 1978 and December 12, 1978, and at those and other meetings, petitioner's president, confronted by a militant minority of members who were vocally advocating a work stoppage, consistently ruled such discussions out of order, refused to entertain any motion for such job action and repeatedly stressed that the executive board disapproved of any work stoppage.

When the strike began on the early morning of December 14 petitioner's president assured NFT Metro's executive vice-president that the union was not responsible for the work stoppage and that the union "would do everything that was possible to keep the busses rolling". He explained that the "trouble" was being caused by a "few people". Indeed the only fair inference to be drawn from the record is that a vast number of union members did not favor or

support the work stoppage. Many uniformed bus drivers reported for work on the early morning of December 14 only to be confronted by picket lines which had been established without union authorization.

Since it is universally agreed that no evidence was presented at the hearing to support the charge that petitioner "caused" or "instigated" the strike, we need only review PERB's determination that petitioner "condoned" the strike. It is premised upon three findings:

(1) That the "unauthorized absence" of executive board members from their work assignments provided "an example for the rank and file members" who followed it.

(2) That the strike ended "pursuant to a vote of [petitioner's] leaders and their direction to the employees to return to work", thus demonstrating that the executive board members had "control of the situation" and could have earlier terminated the strike.

(3) That the executive board members failed "to exert any significant forceful efforts to terminate the strike before receipt of the restraining order".

None of those findings has a basis in the record. As to the first, the evidence presented, not by the charging party but by petitioner, fully accounts for the activities of the executive board members during the period of the work stoppage. David Mulready reported for work at NFT Metro's Niagara Falls Station at approximately 4:15 A.M. on December 14, as did several other bus drivers, who took their buses out on assigned routes. He remained at the station throughout the day, taking phone calls from other employees who were complaining of harassment and threats. He encouraged them to continue working. Three other executive board members, Peter Zoldowski, Frank Sparacino and Daniel Reidy were excused from reporting for regular work because they were engaged in sign-up activities.* Thus they would not have reported for regular work assignment even if there had been no work stoppage. A fifth executive

---

* When one is engaged in sign-up activities he does not report for regular work assignment, but appears at his assigned work location to receive employee requests for bus route assignments which are then made based on employee seniority.

board member, Jimmy Williford, reported for work and punched in. He encouraged other employees to undertake their work assignments, and some did. Williford's time card was punched out by Don Green, representing management, because Williford acknowledged that he was talking on the telephone to petitioner's president. Williford then left work and went to union headquarters. Another executive board member, Edward Bernat, reported for work at NFT Metro's offices and obtained permission to leave work at 10:30 A.M. because of illness. Bernat represented office workers who did not engage in the strike. Two other members of the executive board, Joseph Beyea and Richard Meinke, reported for work respectively at the Frontier and Cold Springs Stations but found that both premises were locked. Their testimony in that regard is supported by that of other witnesses and stands wholly unrebutted in the record. In any event a finding that Beyea and Meinke were absent from their workplace without authorization can hardly be characterized as an "example" to the membership to strike in view of the other uncontroverted evidence that the two spent the balance of the day encouraging union members to return to work. Finally, on this point, no evidence was presented by the charging party to offset the testimony of other executive board members recounting their respective efforts in exhorting union members to return to work.

Similarly, there is no evidence in the record to support PERB's finding that the executive board members had "control of the situation" because the members returned to work upon their order. The truth is that the strike ended when the union leaders informed the membership that the latter were ordered back to work by a restraining order enforceable by imprisonment (see Civil Service Law, § 211; Judiciary Law, §§ 750, 751).

Lastly, PERB's faulting of petitioner for having failed to exert "significant forceful efforts to terminate the strike before receipt of the restraining order" may only be said to equate petitioner's failure to end the strike with having condoned it. The record fully supports the hearing officer's recitation of the efforts of the members of the executive

board to terminate the strike. They included public statements condemning the strike made to the media; visits to the various work sites encouraging union members to return to work; holding themselves specially available for service of the temporary restraining order in order to use it as a lever to force the members to return to work; and promptly disseminating word that the restraining order had been served.

Although the dissenters would wholly ignore the findings of the hearing officer, she alone had the opportunity for personal observation of the witnesses. After an assessment of the credibility of the testimony of the members of the executive board, and upon a comprehensive review and analysis of that testimony, she concluded that petitioner "should not be held responsible at all for the wildcat strike". The evidence supportive of that conclusion stands wholly unrebutted.

In support of her finding that petitioners made good faith efforts to terminate the illegal work stoppage, the hearing officer wrote:

"The President of the [petitioner], upon being advised by the Executive Vice-President of NFT-Metro in the early morning hours of December 14, 1978 that there was trouble at the locations, urged management to remove the pickets and parked cars so that the men could report to work. He then called an Executive Board member to check the locations and report back to him. This was the first indication he received that some type of job action or work stoppage was taking place. When members of the Executive Board called the President later in the morning to indicate that there were picket lines at some of the locations, they were instructed 'to do whatever was possible to get the buses rolling'. The President then reported to [petitioner's] headquarters and, with several Executive Board members, went to the locations to try to talk the men into going back to work for the rest of the day. It was the President's testimony that after visiting the locations and speaking to the men, that they would not cross the picket lines for fear, in part, for their physical safety. Based upon prior discussion with management representatives of NFT-Metro, the Presi-

dent was aware that they were seeking a court injunction and he expected, that when he had the document in hand, that he could persuade the men to return to work. On the evening of December 14, 1978, the President was interviewed on television and stated that the work stoppage was unauthorized and that the men should be back working.

"Having been advised that the injunction was secured late in the evening of December 14, the President directed that all representatives of the [petitioner] should be available for service of the injunction. When, on December 15, the [petitioner's] officials received the injunction, they promptly went to the work locations, instructed the men that they were now required by the court to return to work, and they did."

Not only are the hearing officer's findings fully supported in the record but PERB's determination that petitioner condoned the strike is wholly irrational. Its decision to reject the hearing officer's recommendation appears to be premised upon a judgment that the union could have done more to end the strike in less than the day and a half of its duration. Such speculation, viewed in the context of the whole hearing record, does not rise to the level of "substantial evidence" to support its determination. The danger inherent in its decision on these facts is that a union, despite the best efforts of its leadership, may be held guilty of a violation of section 210 of the Civil Service Law whenever a wildcat strike occurs.

The petition should be granted and the determination annulled.

MOULE, J. (dissenting). On December 14 and 15, 1978 the employees of the Niagara Frontier Transit Metro System, Inc. (Metro), members of the Amalgamated Transit Union, Division 1342 (ATU), engaged in a wildcat strike. On March 13, 1979 the New York State Public Employment Relations Board (PERB) charged that ATU caused, instigated, encouraged, condoned and engaged in a strike, in violation of subdivision 1 of section 210 of the Civil Service Law.

A hearing was held on May 30, 1979 and, in a written report of August 21, 1979, the hearing officer recommended

that the charge be dismissed. PERB rejected the hearing officer's recommendation and found that, while ATU had not caused or instigated the strike, the evidence established that ATU had condoned it.

Under CPLR 7804 (subd [g]) this proceeding was transferred from Special Term for the determination of whether the decision by PERB is supported by substantial evidence.

Until December 14, 1978 Metro and ATU were negotiating a contract to succeed the one that had expired on August 1, 1978. Two tentative contracts had been recommended by ATU's executive board, but were rejected by ATU's membership. The second rejection occurred two days before the strike. At a meeting held on December 13, 1978, the night before the strike, and at other earlier meetings, ATU's president had ruled out of order members who attempted to raise the question of a strike.

More than 90% of the employees were absent at the start of the first shift on December 14, 1978, and the following day, after picket lines were set up at most work locations. The men on the picket lines wore Metro uniforms, and there were additional men in Metro uniforms milling about the work locations who would not cross the picket lines.

On the first day of the strike, the eight members of ATU's executive board conducted themselves as follows: three had previously been excused from reporting to work to engage in "sign-up" activities, in which drivers indicate which runs they prefer based on seniority but, because of the strike, no sign-ups were made; one went to work, became ill and was excused by a supervisor; one reported to work at the Niagara Falls Station but did not take his bus out because, according to his testimony, he remained to handle telephone calls from Niagara Falls drivers who called in to complain of harassment and threats, and to encourage workers to stay on the job; one reported for work but was dismissed by a supervisor for conducting union business over the telephone, after which he went outside to try to get the men to work and later returned to the union office; and the remaining two members reported to work but did not punch in, claiming the buildings were closed apparently to prevent strikers from damaging the buses and, after failing

to talk the men into going to work, they reported to ATU's headquarters for further instruction.

On the second day of the strike, the executive board members of ATU were directed by their president to report to headquarters, rather than to fill their regular assignments. He said he wanted them available to receive service of a temporary restraining order. The three executive board members who were engaged in sign-up activities claimed that they were excused from their normal duties, because they usually received Friday off as a fringe benefit for such activities but they went to union headquarters. The board member who had been excused for illness on the first day had also been excused for the second day of the strike because he was a witness in an arbitration hearing.

During the afternoon on the second day of the strike, the executive board members of ATU were served with a temporary restraining order requiring the men to go back to work. It was at this time that the board members decided to take a vote to honor the temporary restraining order and to establish an official position that the union was opposed to the strike and the men should return to work.

ATU is charged with condoning a strike in violation of section 210 of the Civil Service Law. The statute provides as follows:

"1. No public employee or employee organization shall engage in a strike, and no public employee or employee organization shall cause, instigate, encourage, or condone a strike * * *

"3. (e) In determining whether an employee organization has violated subdivision one of this section, the board shall consider (i) whether the employee organization called the strike or tried to prevent it, and (ii) whether the employee organization made or was making good faith efforts to terminate the strike."

In addition, the statute creates a rebuttable presumption that an employee who is absent from work without permission, or who abstains from the full performance of his duties in his normal manner without permission when a strike occurs, is presumed to have engaged in the strike

(Civil Service Law, §210, subd 2, par [b]; see *Matter of Sanford v Rockefeller*, 35 NY2d 547).

PERB found that ATU had condoned the strike for the following reasons. First, that the unauthorized absence of many of ATU's leaders was highly significant and their action constituted an example for the rank and file members. Second, that ATU condoned the strike because the union's leaders failed to exert any significant forceful efforts to end the strike before they received the temporary restraining order. Finally, PERB found that the fact the men returned to work after the vote of the leaders directing an end to the strike demonstrated a control of the situation that should have been exercised before the temporary restraining order was received. Contrary to the assertion by the majority, *Matter of Police Benevolent Assn. of City of Yonkers v New York State Public Employment Relations Bd.* (51 NY2d 779) is not applicable on this point; PERB did not rely upon a presumption that a union has consented to a strike where a vast majority of its members participated in it, but based its determination squarely on the three reasons stated above.

Judicial review of a determination rendered by an administrative body after a hearing is limited to consideration of whether that determination is supported by substantial evidence upon the entire record *(Matter of Purdy v Kreisberg*, 47 NY2d 354, 358; *300 Gramatan Ave. Assoc. v State Div. of Human Rights*, 45 NY2d 176, 181; *Matter of Pell v Board of Educ.*, 34 NY2d 222, 230-232; *Matter of Holland v Edwards*, 307 NY 38, 44; *Matter of Stork Rest. v Boland*, 282 NY 256, 266-267; CPLR 7803, subd 4). The reviewing court may not substitute its own judgment of the evidence for that of the administrative agency, but should review the whole record to determine whether there is a rational basis to support the findings of fact upon which the agency's determination is based *(Matter of Purdy v Kreisberg, supra,* p 358; *300 Gramatan Ave. Assoc. v State Div. of Human Rights, supra,* p 182; *Matter of Pell v Board of Educ., supra,* p 231). This court must determine if the evidence adduced at the hearing provides substantial evidence from which a rational fact finder could infer that

ATU condoned the strike (see *Matter of Police Benevolent Assn. of City of Yonkers v New York State Public Employment Relations Bd., supra*). While the majority obviously differ with PERB in their interpretation of the facts, it is basic law that we cannot substitute our judgment of the facts for that of PERB's, and we are legally bound to limit our review to an examination of the record for a determination of whether there is a rational basis to support the agency's determination. The correctness of the hearing examiner's evaluation is not at issue, and only the facts and their relation to PERB's determination can be considered. Consequently, the quotations of the hearing officer which are set forth in the opinion by the majority are of no relevancy.

PERB found that many members of ATU's executive board did not perform their regular assignments during the strike and that their absence was unauthorized, thereby condoning the strike (Civil Service Law, § 210, subd 2, par [b]). The majority asserts that 2 of the 8 executive board members were absent from their work without authorization because they had been locked out. One of these men testified that when he arrived at the Frontier Station garage, there were cars blocking the drive and that he did not believe the station was open, but he did not try to open the garage doors. The other testified that he reported to the Cold Springs Station garage and encountered a lot of people milling about, some saying that the doors were locked. He apparently did not try to open the doors himself and also testified that later on that day the station was open. The record, considered as a whole, does not suggest that there was an over-all "lock out" by management against Metro employees during the first day of the strike. There was testimony by one of the executive board members, who claimed to be excused for sign-up activities, that he personally tried to unlock the doors at the Cold Springs Station at approximately 4:15 A.M. and that the key would only go in half way and the door could not be unlocked. He also testified two members of management, his district manager and the station master, tried to open the doors and were also unsuccessful. However, there was additional testimony that sometime after 6:00 A.M. the Cold Springs Station shop was open and

that an executive board member representing shop employees had no difficulty in punching in; that later on in the day the Cold Springs Station was open; that the Niagara Falls Station was open; and that the Metropolitan Transit Center was open and all the clerical employees were working that day.

PERB also found that during the first day of the strike the record did not support the three executive board members' claim that they were excused from their regular duties to conduct sign-ups. In addition, there was another member who reported for work but was dismissed that morning for engaging in union activity instead of his normal duties, another engaged in other activities without management authorization, and another was excused for illness.

On the second day, which the majority does not consider, it appears all of the eight members failed to perform their regular duties. One member was legitimately excused to participate in an arbitration hearing. Three members claimed they were entitled to the fringe benefit of the day off because of sign-up activities; however, PERB found the record did not support their claim. These three members, along with the other four, apparently followed the directions of the president to report to union headquarters at 8:00 A.M. rather than to fill their regular assignments. These directions had not been authorized by management. PERB determined that many of the executive board members failed to perform their normal duties without authorization, and the evidence as to the activities of the board members for the two days of the strike provides a rational basis for this determination.

PERB also found that the ATU failed to exert any significant forceful efforts to terminate the strike before receiving the temporary restraining order. The record shows that on Thursday, December 14, 1978, ATU's president, in response to a television reporter's questions, stated that the strike was unauthorized and the men should go back to work. However, PERB found that he and some members of the executive board visited some of the work locations but they did not direct employees to return to work.

The record also shows that most of the executive board reported to union headquarters sometime during the first day of the strike and that they were directed to appear at union headquarters at 8:00 A.M. by their president on the second day of the strike; yet they waited until after the temporary restraining order was served, sometime after noon, before taking official action. While some action was taken before the temporary restraining order was served in that some of the board members testified they personally urged the men back to work, a rational determination can be made that more could have been done. The board could have voted to condemn the strike officially the first day or early on the second, the police could have been called to offer protection to those who did not cross the picket lines out of fear for personal safety, or they could have threatened those members who supported the strike with union sanction. However, none of these actions or any other demonstrating a good faith effort on the part of the union against the strike was taken.

Finally, PERB found that the fact the men returned to work after the vote of the leaders directing an end to the strike demonstrated a control of the situation that should have been exercised before the temporary restraining order was served. The majority asserts that there is no evidence in the record to support this determination and claims the strike ended only because the union leaders informed the membership that the latter were ordered back to work by a temporary restraining order enforceable by imprisonment. To assert that the order was responsible for ending the strike is mere speculation because both the vote by the executive board and service of the temporary restraining order occurred virtually simultaneously. PERB made a rational decision based upon all the relevant circumstances, and this court cannot substitute its judgment or interpretation.

The danger inherent in the decision of the majority is the usurping of PERB's legitimate function. Whether or not we would have made the same determination if we were to decide the facts is not the issue. The sole question is whether there is a rational basis for its determination. On this record a rational fact finder could infer that ATU con-

doned the strike, and we cannot disturb such a determination *(Matter of Police Benevolent Assn. of City of Yonkers v New York State Public Employment Relations Bd.,* 51 NY2d 779, *supra).*

The determination of PERB should be confirmed.

HANCOCK, Jr. and CALLAHAN, JJ., concur with DILLON, P. J.; CARDAMONE and MOULE, JJ., dissent and vote to confirm the determination in an opinion by MOULE, J.

Petition granted, with costs, and determination annulled.