Breitel, J. (dissenting).
The findings of an administrative agency, in a matter within its jurisdiction, are conclusive (e.g., Matter of Lynch’s Bldrs. Rest. v. O’Connell, 303 N. Y. 408, 410; 1 N. Y. Jur., Administrative Law, §§ 185, 192). Even if the court holds views strongly contrary to that of the agency, it may not substitute its own views for those of the agency (Matter of Stork Rest. v. Boland, 282 N. Y. 256, 267, 274; cf. Matter of Holland v. Edwards, 307 N. Y. 38, 44; Matter of Avon Bar & Grill v. O’Connell, 301 N. Y. 150, 153; see, Matter of Club 95 v. State Liq. Auth., 23 N Y 2d 784).
In pertinent part, the Authority in this case found that after the initial dispute at the checking area:
“An employee, Bruce Graziano, was called over and after a short discussion he requested Kendall to follow him which he did. Then Hanford, Jr., spied his coat, pointed it out to the girl who gave him the missing garments. He turned around, looked for his friend but he was nowhere in sight.
“ While Hanford, Jr. was peering into the cloak room, Graziano escorted Kendall past the bar area, out a door to the service or receiving department, which was definitely restricted to employees only, and told him to get out. Kendall refused, Graziano then pushed him towards the. door. While Kendall was trying to remove his jacket, Graziano tried to run him into a wall causing him to fall to his knees where he finally removed his jacket. He got up, made a fist and attempted to strike Graziano when he was grabbed from behind by an employee of the licensed premises and a known patron. While he was held, Graziano punched him in the eye. After delivering the punch Graziano ran away, then Kendall was released and when he attempted to follow, the guard at the service door blocked his path.”
The testimony, also in pertinent part, hut without deletion *, by Mr. Kendall, reads:
“ When he got out the door, there were a couple of stairs there. I went down the stairs, following him again. When I got down to the bottom of the stairs I knew, of course, at this point that he was going to tell me to get out and he did. *552 He said, [1] Get out that door,’ pointing to the service exit door.
‘ ‘ Q. Was there anyone else around other than the two of you at this point? A. Not that I saw, at that time. All I saw was him.
“ Q. What did you say or do when he told you to get out? A. I said, ‘ I am not leaving until I get my hat. ’
“ Q. What did he say or do? A. Well, with that, he pushed me towards the door and just said, ‘ Get out.’
[1] ‘ Q. Then what happened ? A. I tried to throw my coat off to defend myself. I wasn’t planning to leave the club under any circumstances without the hat. At this point I was getting angry. I was trying to throw the coat off. He grabbed me in an armlock and he tried to run me into the wall. I fell down to my knees. I got up and at this point I threw my coat off and I pulled my arm back like this (indicating). It was about at this level (indicating) and it was grabbed.
‘ ‘ Mr. Eosenstein: Can the record indicate what the witness is doing?
‘ ‘ The Witness: At about shoulder level, and I made a fist.
‘ ‘ Mr. Pollack: Let the record indicate that the witness said he drew his arm back as if to strike.
“ The Witness: Yes, please.
“ Mr. Eosenstein: Can you indicate for the record, Commissioner, what the witness is doing?
‘ ‘ Comm. Myers: The witness has testified that he drew his arm back to shoulder level and his hand was in the form of a fist.
“ The Witness: That’s right.
“ Q. What happened then? A. Well, at that point my both arms were grabbed from behind and Mr. Grazzino[sic] just threw a punch at me.”
Notably, Mr. Kendall candidly admits cocking his arm and clenching his fist, but he said it occurred only after he had been felled to his knees as he was trying to remove his coat to defend himself, and after an armlock had been placed on him. As for the excessive force being used in a nonpublic area of the premises, this must be immaterial. Otherwise it would be a statutory violation for a licensee to beat up its patron in the public area but not so if the licensee diplomatically entices the patron into a more secluded place, or even onto the street, *553 where the beating may be administered without distress to the other patrons. If believed, this testimony supports the Authority’s findings. Consequently, the conclusive fact for this court is that excessive force was used by a bouncer in this licensed and regulated establishment.
True, the Authority had once advised the licensee that it was entitled to use reasonable force to maintain order or to eject unruly patrons. But this advice, rather admonition, was given to the licensee as a limitation and not a condonation. The admonition was contained in a notice of warning. It followed a complaint by another hapless patron of sustaining a knee injury when he and two companions were pushed down a flight of stairs. The licensee was advised that the use of undue force was a violation of the regulatory statute and would be so regarded by the Authority.
In Matter of Club 95 v. State Liq. Auth. (supra), decided by this court one day after this case was argued, it was said 11 Notwithstanding the several self-contradictions and the general unreliability of the testimony of the complaining witness, Spencer, there was substantial evidence to sustain the determination by the Authority, the sole arbiter of the issues of fact ”. In that case, the complaining witness had shared a pint of gin with a friend, and visited other bars, before coming to the licensee’s bar and consuming another three or four double drinks; told a bizarre - story of walking around and exposing a bundle of currency, including a $100 bill borrowed from a personal loan company the day before or two weeks before; lied and then corrected his testimony as to whether his estranged family was receiving welfare aid for which he had to sign; and at different times to different people told materially variant stories of what happened in the bar.
Nor may a viable distinction be made between an employee „ left in charge of premises and another. The distinction would inadvertently occasion improper discrimination between larger and smaller premises. Thus, it would encourage the manipulative use of subordinates (and a studied ignorance by supervisors) to accomplish whatever the licensee wished to condone or encourage within the whole range of prohibited activities in licensed premises, from bookmaking through sales to minors, to assignations with prostitutes, until the first official discovery. *554 Indeed the Club 95 case (supra), and this one, present the striking parallel that the bartender in the one and the bouncer in the other were no longer employed or even available as witnesses at the time of the hearings.
Matter of Missouri Realty Corp. v. New York State Liq. Auth. (22 N Y 2d 233) involved a porter-clerk in the licensed premises, a bowling alley, who, before its bar was opened for business, enticed an 8-year-old boy to an upper floor to commit an act of indecency. This was not a normal risk in licensed premises and, as noted by the court, the offending act “ was in no way connected with the duties of the employee nor in furtherance of the employer’s business ” (p. 237). Hence, the case is irrelevant.
Matter of Migliaccio v. O’Connell (307 N. Y. 566) involved the conduct of patrons, namely, solicitation by prostitutes on the premises for which actual or constructive knowledge by pattern conduct is required (e.g., Matter of Stanwood United v. O’Connell, 306 N. Y. 749, affg. 283 App. Div. 79). That is not the category of case in which this one falls.
The greatest danger presented by the court’s holding in this case is the dictum applied to the conduct of a licensee’s agents, that prohibited conduct is not suffered or permitted unless it was, or should have been, known to the management. The effective regulation of thousands of licensed establishments in the State depends, as a practical matter, upon placing the duty of supervision on management as to all normal risks of the enterprise when employees are involved, and as to all normal risks based on patterns of conduct when patrons are involved. That is precisely the distinction made by this court so recently in the Club 95 case (supra) when it said, “ Moreover, where the licensee’s agent is instrumental in creating the disorder, n it is generally not necessary to establish a foreseeable pattern of conduct ”, citing a criminal case, People v. Hawk (268 N. Y. 678, affg. 156 Misc. 870), in which a licensee was convicted for a sale for off-premises consumption by an employee without the knowledge of the licensee.
In the Club 95 case (supra) the license was cancelled. Of course, it was a little place, not known at all except in the grimy vicinity in which it was located. But the licensee there argued that the cancellation would imperil a $40,000 enterprise. *555 The suspension here would, according to the licensee, entail a larger loss, namely, $50,000. The licensee operates a large place, one of a highly publicized national chain. Its loss could be absorbed easily or even retrieved over a period of time. The matter of sanctions, however, rests with the Authority except for abuse of discretion (CPLR 7803, subd. 3; 8 Weinstein-KornMiller, N. Y. Civ. Prac., par. 7803.15; cf. Matter of Fischer v. Kelly, 17 N Y 2d 521).
Accordingly, I dissent and vote to affirm and sustain the Authority’s determination.
Judges Burke, Scileppi, Berg an and Keating concur with Chief Judge Fuld; Judge Breitel dissents and votes to affirm in an opinion in which Judge Jasen concurs.
Order reversed, etc.
(Appendix)
She said, “Do you have .the ticket?”
I told her that I had given her the ticket.
She said, “You only gave me one ticket.”
Q. What did you say? A. I said, “ That’s all we have. Both of us patted our pockets and felt up here and down here (indicating) and all through all the pockets and neither of us had another ticket.”
She again said, “ Get out of the way.”
We — as Mr. Hanford said — said, “Well, it’s February, it’s cold outside. We will be glad to go, but will you please give us our hat and coat.”
It was this conversation, pretty much the same thing, “ Get out of the way. Fine, please give us our hat and coat.” This lasted perhaps a minute, minute and a half.
Of course, the people were building up behind waiting for us to get out of the way. The girl just kept saying, “ Get out of the way.” There was no, “Will you please step over to the side, I will call the manager and he can come back and check it.”
One of us, Mr. Hanford, I believe, suggested that she let us go back and find the hat and coat. She told us that no one was permitted ¡behind the check room bar and that we should get out of the way.
After about a minute and a half, instead of saying, “Get out of the way,” she made, a motion like this (indicating).
Q. You are indicating by raising your right hand? A. Indicating to come here, please. I looked that way and I saw who I later learned to be Mr. Grazzino [sic] came up the stairs.
He said to.me, “Get out of the way.”
Q. Did he speak to the girl before he talked to you? A. Well, “ What’s the matter?”
*556 She said, “These people won’t get out of the way.”
He said to me, “ Get out of the way,” and I again —
Q. Were those the first words he said to you? A. That’s right, as I recall this.
He didn’t say, “What’s the problem?” He didn’t ask the girl what the problem was. She just said, “ These people won’t move.”
He said to me “ Get out of the way, move.”
' I started to explain, I couldn’t quite believe that he would say this. He said it in a forceful manner. I started to explain that we would be glad to leave, but we are trying to get our hat and coat. Before I could finish, he said, “Well, all right, follow me,” or words to this effect, “All right, follow me and we will settle this,” or something like that.
He turned around and I followed him. I thought at first that he would take me around to the back of the check room —
Comm. Myers: Tell us what happened, what actually happened.
Mr. Rosenstein: There has been no objection.
Comm. Myers: I am interposing an objection. Just tell us what happened. A. (Continuing) Well, I followed him. He went back towards the bar area and went down the stairs, turned left and I followed behind him. He said nothing further to me. He just walked straight ahead. I followed him.
Q. Did you know where you were going? A. Well, I knew that I wasn’t going to the hatcheck room. I didn’t — I knew the doorway he was going through led up the stairs to the second floor of the club and so forth on up and instead of going up the stairs I followed him straight ahead out a door into what I would call a service area.

 Added as an appendix is the testimony of Mr. Kendall as to what happened just before he was taken to the service area.