Daniel G. Albert, J.
The two petitioners, residents of the East Meadow School District and more particularly the area serviced by the Salisbury Elementary School (hereinafter referred to as the Salisbury area), instituted this proceeding on April 5, 1973 pursuant to CPLR article 78 to compel the respondent, the East Meadow Board of Education, to provide funds in the proposed 1973-74 school budget for the continued operation of the Salisbury school. Two hundred and fourteen other residents of the Salisbury area have moved to be joined as plaintiffs herein, and their motion is treated as one for leave *172 to intervene and granted in all respects. (CPLB 1013; Del Prete v. Lorenz Schneider Co., 33 A D 2d 1021 [2d Dept., 1970].)
At a public meeting of the school board on April 30, 1973 the board voted 5 to 1 to close the Salisbury school at the end of the current school year, and the question presented to the court is whether this determination ‘ ‘ was affected by an error of law or was arbitrary and capricious or an abuse of discretion” as those terms are used in subdivision 3 of CPLB 7803.
At the trial herein counsel for the board withdrew its two stated affirmative defenses and stipulated that the original petition had been verified in accordance with subdivision (d) of CPLB 7804 and that this proceeding would not be challenged as premature.
It is fundamental in an article 78 proceeding such as this that the court will not substitute its judgment for that of the public body or officer, but rather must decide whether the determination of the school board should be set aside either because it had no basis in fact (Matter of Mandle v. Brown, 5 N Y 2d 51 [1958]), or because it was arbitrary and capricious (Matter of Le Tarte v. Board of Educ. of Lake Pleasant Cent. School Dist., 65 Misc 2d 147 [Sup. Ct., 1970]), or because it constituted an abuse of discretion (Matter of Council of Supervisory Assn. of Public Schools of N. Y. City v. Board of Educ. of City of N. Y., 23 N Y 2d 458 [1969]). Where there is a rational legal and factual basis for a school board’s administrative determination, the court will not overturn such decision and substitute its own judgment even if it would have reached a contrary conclusion. (Le Tarte v. Board of Educ. of Lake Pleasant Cent. School Dist., supra.) (See, also, Matter of Park East Land Corp. v. Finkelstein, 299 N. Y. 70 [1949]; Matter of Stork Rest. v. Boland, 282 N. Y. 256 [1940]; Semple v. Miller, 38 A D 2d 174 [4th Dept., 1972]; Matter of Arglo Painting Corp. v. Board of Educ. of City of N. Y., 47 Misc 2d 618 [Sup. Ct., 1965].) With these criteria in mind, what are the facts of this proceeding?
The East Meadow School District (Union Free School District No. 3) has a total school population as of September, 1972 of 13,902 students in eight elementary schools (Barnum Woods, Bowling Green, McVey, Meado wbrook, Newbridge Boad, Parkway, Prospect and Salisbury), two junior high schools (McCleary and Woodland), and two senior high schools (Clarke and East Meadow). The school board’s 1972 census indicates that the district has a total population of 60,021 people and 15,020 occupied dwellings, almost 4 people per dwelling. The district ranks 53d out of 57 school districts in this area based upon *173 próperty value per pupil, the median being $43,508, with East Meadow’s property value per pupil being $23,790. While the president of the district’s teachers’ association testified that more money had to be spent by the residents to achieve better quality education (a not unlikely position for Mr. May to espouse), the district is concededly facing a financial crisis.
The proposed 1973-74 school budget is to be submitted to the voters on June 13, 1973, and when the first draft of such budget was presented to the board by the school administration it contained no provision for eliminating any of the elementay schools. In such initial form it required a tax increase of more than $3 per $100 of assessed valuation, and the board thereupon directed the Superintendent and his administrative staff, as well as the Citizens Budget Committee, to pare down the proposed budget wherever possible. To this end and in light of the concededly declining enrollment in the district’s student population (18,500 in 1964; 16,186 in 1969; 13,902 in 1972, and a projected [and challenged] 11,575 in 1976), the board directed the Superintendent to review the school enrollment situation, to project the number of students in the district for the next few years, to analyze all relevant factors and to determine if it was reasonably possible to close any one of the eight elementary schools.
Of these eight, the three newest were constructed as a result of the post-war baby boom in the mid-1950’s, and one of these, the Salisbury School, had the smallest enrollment in the district: 291 students out of a State-rated capacity of 960.
At a crowded public hearing held at the East Meadow High School on March 29, 1973, Superintendent Walsh used an overhead projector and large screen to report to the board and the over 1,000 residents in attendance what the effects would be of separately closing each of the eight elementary schools and transferring its pupils to the remaining seven. The meeting was generally conceded to be noisy and heated, focusing primarily on the possible closing of the Salisbury School or the older Newbridge School (which has a student population of 766 out of a State-rated capacity of 1,050). The meeting adjourned with no action taken, and a further crowded and noisy public hearing was held one week later on April 5, 1973, the day the order to show cause herein was signed. It was at this meeting that the respondent board indicated its tentative decision by a 6 to 1 vote to close the Salisbury School, but a final decision was delayed until April 30, when the board voted 5 to 1 to close the school at the end of the present shoal year and to transfer all students to the nearby Bowling Green school, *174 a much larger school (1,180 students with a State-rated capacity of 1,800) with a declining enrollment and ample room to accommodate the Salisbury students.
Was this determination without any basis in fact, arbitrary, capricious or an abuse of discretion? Decidedly no. Whether it is the wisest step to take at this time is not for the court to decide. Whether there will be a diminution of educational quality is not for the court to decide. Whether the court would have voted to keep the Salisbury School open based upon the evidence then and now before the board is not the question. Rather, we must ask if the board, after a careful review of the entire matter, made a rational, reasonable and justifiable decision in the interest of the entire school district and without malice to any particular section thereof. This question must be answered in the affirmative, and the respondent board is therefore entitled to judgment dismissing the petition herein.
Five members of the school board testified at the trial herein, along with the district Superintendent Martin T. Walsh, and each described in varying detail the above-mentioned public hearings and meetings; the financial crisis facing the school district; the history of the various proposals for administrative centralization; and the evidence upon which their decision to close the Salisbury School was based. Moreover, a current candidate for position on the school board discussed in great detail, the nine-month preparation in 1971 of the Report of the Community Committee to Study Better Utilization of Existing Educational Facilities, otherwise known as the “ G-rause ” report, which made certain recommendations for centralization which were not accepted by the board (and which are not in question here).
President of the school board, Michael F. Meyer, Assistant Dean at Nassau Community College, testified in detail as to the study that the board had asked the administration to make in order to ascertain if any of the elementary schools could be phased out. Factors to be considered included space requirements, bussing, safety, class sizes, major thoroughfares to be crossed, teacher-pupil ratio, and most importantly whether there would be any diminution of educational quality. Some of the administration’s data was distributed to the residents at the March 29 hearing and was discussed and studied extensively by the board, which ultimately concluded that Salisbury School should be closed since it had the smallest enrollment of the eight elemenary schools in the district, and therefore the smallest number of students to be displaced. In fact, its projected *175 enrollment into 1976 would be even less than it is now (down to 192, not including special students who are bussed in from other areas and who can be bussed to another school just as easily). Regarding bussing, it was established that there would be little or no increase in cost by bussing the Salisbury children to Bowling Green, a short distance away, since the district would use the same fleet of busses which already services the Bowling Green area. The evidence indicated that the Salisbury area students would have to cross Stewart Avenue, a wide multilane road, but also that hundreds of the Bowling Green students already do cross Stewart Avenue, that at the schdol there is a traffic control signal and school crossing guards, that there have been no fatalities or even accidents involving Bowling Green children on their way to or from school, and that the school administration would consult the Nassau County Police to ensure that adequate safety precautions would be taken.
When questioned about the board’s interest in leasing Salisbury School to BOCES (Board of Co-operative Educational Services) or otherwise, Mr. Meyer testified that the board was considering such a plan, but that any lease would have to conform to the requirements of section 403-a of the Education Law which, among other things, mandate that such lease be revocable by either party on one year’s notice, that it be for a term no longer than five years, and that the lessee be obliged to restore the premises to their original condition at the termination of the lease. Accordingly, the board always has the option of reopening the school within one year if circumstances warrant, and Mr. Meyer and several other board members testified that they would not hesitate to vote to reopen Salisbury School if such a step appeared necessary in the future.
The evidence clearly established that, in light of the continually declining enrollment at both Bowling Green and Salisbury, the number of students to be transferred from the latter to the former can be easily accommodated at Bowling Green. The teacher-student ratio at Bowling Green in the next few years will not be unduly affected, and in the opinion of some of the board members the very low teacher-student ratio at Salisbury School was an educational hindrance (citing lack of fellow grade-level teachers, lack of children to associate with, inefficiencies in the use of special teachers, etc.), which will be eliminated with the transfer of these students to Bowling Green. Every board member who testified, including the former president Norman Bard who cast the single negative vote on April 5 and April 30, stated that he or she was absolutely convinced by personal *176 research and objective data that there would be no lessening of the quality of the education for the transferred students or for the present Bowling Green students. Several, in fact, toured the Bowling Green complex (actually two school buildings connected by a breezeway) for several hours one evening with Superintendent Walsh, who explained the physical changes which would have to be made, indicated the class sizes and generally assured such members, including Mr. Bard, that the quality of the youngsters’ education would not suffer. Interestingly enough, even Mr. Bard conceded that one or even two schools will have to be closed, but he felt that an over-all plan should be developed for such closings and redistricting. He voted against the closing of Salisbury School at this time because the board’s action, in his opinion, was unintentionally pitting one part of the community against another, one religious group against another, something which he felt should have been avoided- More will be said about this issue later.
The chief emphasis of the petitioners was to attack thqboard’s statistics which indicated a continuing declining enrollment in the Salisbury School and in the other elementary schools. Following the board’s decision the petitioners compiled figures to indicate that, based upon trends in the buying and selling of houses in the Salisbury area, a so-called baby boom could be expected by 1976 and that therefore the board’s data upon which it based its decision was inaccurate. This argument, despite the sincerity of the petitioners, does not convince the court that the board’s decision is without any basis in fact. First of all, all projections are by nature speculative and imprecise, and mlist be understood as such. The board’s projections, based upon its annual census which is generally accurate to within 2%, may be proven wrong when the school district’s enrollment is counted in 1973,1974,1975 and 1976, but the projections were not proven wrong at the trial herein. What was shown was that reasonable and qualified men can differ as to how a school’s enrollment should be projected and as to how trends in movement of homes can be utilized. Even so, the petitioners ’ figures dealt only with the Salisbury area, not any of the other seven areas in the district, and Superintendent Walsh stated emphatically that even if the petitioners’ figures were accurate projections, the declining enrollment at Bowling Green would still enable that facility to accommodate all of the Salisbury students. And again, if it is necessary to reopen the school this could be accomplished with a minimum of difficulty. Understandably, this does not satisfy the petitioners who have lost their neighborhood school *177 and who cannot be pleased by a mere prospect that it may be reopened some day, but theirs are not the only interests in issue here. All of the residents of the school district have an abiding interest in the proposed budget, in whether one or more schools will be closed, and the board must represent all of its constituents. In light of this manifest interest on the part of all of the residents of the East Meadow school district, the court suggested to the litigants that perhaps the most democratic and equitable means of resolving the issue raised herein, i.e., whether the Salisbury School (or any other school) should be closed, would be by referendum throughout the school district on June 13 when the budget is to be voted on. This was acceptable to the school board, but was rejected by petitioners because, quite candidly, they thought they could not prevail. While their premonition may have been accurate, their confidence in our democratic system is less than overwhelming. Based upon reasonable projections and a myriad of other factors, including safety, bussing, class sizes, teacher-pupil ratio, available facilities, finances and quality of education, the elected officials of the petitioners ’ school district have determined that in the interests of the entire district a particular school should be closed and that the quality of education for all the students in the district will not be diminished in any degree. That determination was based on reasonable grounds and was made by the board mem'•'bers elected by the community for the very purpose of making such difficult decisions, some of whom are highly qualified professional educators. Accordingly, the decision of the board will not be disturbed by this court.
Finally, I address myself to petitioners’ ill-advised interjection into this case of the issue of religious bigotry. The accusation was made in open court by petitioners’ counsel, himself a resident of the Salisbury area, that the decision of the board was prompted, wholly or in part, by a feeling of anti-semitism on the part of the board members. The petitioners were admonished by the court to refrain from raising such a bitterly emotional issue unless they strongly felt that the charge could be established, and I most strenuously pointed out that the discussion of such a divisive issue in open court could have the harmful effect of rending the community further apart and causing greater animosity within the school district among the children and especially the parents. It is sad to say that the accusation of religious prejudice was less than ill-advised: it was totally baseless, and not one shred of proof to sustain the charge was adduced. The only hint at religious bigotry was in the asking *178 of the question by petitioners’ counsel: every board member denied it; Superintendent Walsh, with his doctorate degree from Yeshiva University, strongly denounced the suggestion that such feelings existed on the part of the board or the administration; and Norman Bard, the one board member who voted in petitioners’ favor to keep Salisbury School open, decried the implication of petitioners that the board was motivated by religious prejudice. In sum, no evidence was called to the court’s attention to substantiate such a charge, and it is thus disregarded as without merit. I hope this religious issue is now laid to rest and that this fine community will once more operate as a homogeneous entity in promoting quality education for its youngsters.
Short-form orders, granting the motion to add 214 petitioners and granting the respondent judgment dismissing the petition herein, have been signed simultaneously herewith.