[800 NYS2d 137]

In the Matter of CHRISTOPHER MAPP, Petitioner, v GREGORY BURNHAM, as Chief Technology Officer of Port Authority of New York & New Jersey, et al., Respondents.

First Department, August 18, 2005

### APPEARANCES OF COUNSEL

*Traub & Traub, P.C.*, New York City (*Doris G. Traub* of counsel), for petitioner.

*Milton H. Pachter*, New York City (*Anne M. Tannenbaum, Carlene V. McIntyre, Angel Kelley* and *Racquel Reinstein* of counsel), for respondents.

### OPINION OF THE COURT

CATTERSON, J.

In this transferred CPLR article 78 proceeding, this Court is called upon to review the Port Authority's determination to terminate petitioner's employment following an administrative hearing.

Judicial review of an article 78 proceeding is limited to whether the determination was supported by substantial evidence. (CPLR 7803 [4].) "[A] determination is regarded as being supported by substantial evidence when the proof is 'so substantial that from it an inference of the existence of the fact found may be drawn reasonably.' " (*300 Gramatan Ave. Assoc. v State Div. of Human Rights*, 45 NY2d 176, 179 [1978], quoting *Matter of Stork Rest. v Boland*, 282 NY 256, 273 [1940].) A reviewing court must determine whether there is a rational basis for the findings of fact supporting the decision in question by reviewing the whole record. (*300 Gramatan Ave. Assoc. v State Div. of Human Rights*, 45 NY2d at 182.) Upon a review of the whole record in the instant case, we conclude that the evidence is insufficient, and therefore find that the determination lacks a rational basis and must be annulled.

At the time of the terrorist attack of the World Trade Center on September 11, 2001, petitioner was employed as a senior product consultant in the Technology Services Department of the Port Authority of New York and New Jersey. In a memorandum to defendant Joseph Seymour, Executive Director of the Port Authority, defendant Gregory G. Burnham, the Chief

Technology Officer of the Technology Services Department, recommended that petitioner be terminated from his employment because he applied for and accepted financial aid from the American Red Cross (hereinafter referred to as the Red Cross) based upon misleading information that petitioner allegedly provided concerning his employment status in the aftermath of September 11th.

After an administrative hearing was conducted, the designated hearing officer recommended that petitioner be terminated. In particular, the hearing officer based his decision upon the following evidence: (1) the petitioner's statement to the Red Cross representative that he was "laid off" when he had not been terminated, and was in fact receiving his paycheck; (2) petitioner's written statement given to the Office of the Inspector General in which petitioner apologized "profusely" for his actions, which the hearing officer found to be indicative of petitioner's guilt; and, (3) the petitioner's testimony that he needed financial assistance from the Red Cross to pay for future childcare,[1] while the Red Cross document at issue states that petitioner had requested the funds to pay for outstanding debts, and petitioner used the money to pay the arrears for his children's after-school program. The hearing officer found such evidence sufficient to support the termination in that these actions were "a significant violation of the General Rules and Regulations for All Port Authority Employees" and, in particular, brought "discredit to the Port Authority."[2] On May 14, 2003, after review of the recommendation, the termination was made final.

Petitioner began his employment with the Port Authority in 1986. On the morning of September 11, 2001, petitioner exited a subway station near the World Trade Center and learned that the two towers had been struck by planes. Petitioner was close enough to observe first-hand the horror as people leapt from the buildings, as well as the actual collapse of both towers. He described in detail the mental trauma he suffered in the aftermath of the attack. Petitioner had also been present during the 1993 World Trade Center bombing and suffered emotional trauma from that event, which resurfaced as a direct result of September 11th. Petitioner's psychologist, Dr. Robert Axel, who

1. Petitioner is the legal guardian and single parent of his two nephews who were born to his drug-addicted sister.

2. Respondents argue that petitioner violated provisions of the "General Rules and Regulations for All Port Authority Employees" found in chapter 2, paragraphs 1 and 3; chapter 3, paragraph 1; and, chapter 4, paragraph 1.

had been treating petitioner since 1991, testified as to the acute stress disorder that petitioner suffered as a result of September 11th.

On September 14 and 28, 2001, petitioner received his biweekly salary. On October 4, 2001, petitioner went to the Red Cross site for assistance. The Port Authority introduced into evidence at the hearing a Red Cross document entitled "Disaster Registration and Case Record" that was filled out for petitioner by a Red Cross employee that day. The Red Cross representative had written "client is presently layd [sic] off and will be-called back to work as soon [sic] the company will relocate." In another section, the representative wrote "client states that he is helpful [sic] that as soon as the company relocate [sic] he will be called back to work." The document is signed by the petitioner in two places: one signature stands alone and the other authorizes the release of confidential information. Petitioner states that he was told to sign it by the representative and did so without reading it. Indeed, no affirmation or attestation as to the veracity of the document or the information contained in it is present anywhere on the form. In addition, there is no language on the form, or place for petitioner to sign his name or initials, to indicate that petitioner either read the document or that it had been read to him.

The petitioner has always maintained that after viewing Red Cross fliers offering assistance to victims of the attack, he went to the Red Cross center and told the representative that he needed help with childcare because of the stress he was feeling. According to petitioner, the representative told him he had to go to another location for that assistance, and he got up to leave. She then told petitioner that they could help him by giving him a financial gift that he could use to cover childcare expenses, so he sat back down. Petitioner explained that he told the representative that he worked for the Port Authority and showed her his employee identification card. He told her that he was displaced from his job location and would be called back. He testified that he never told her that he was "laid off." It is uncontroverted that the form in issue was filled out by the representative and not petitioner.

Petitioner further stated that later that day, after speaking to a friend at a memorial service, he thought that he might have done something wrong so he called the Red Cross the next day to clarify that he was indeed still employed and receiving his

paychecks.[3] He was told by the Red Cross representative over the phone that he need not return the money, that it was a gift and if he needed it he should keep it. No testimony or other evidence from the Red Cross was introduced at the hearing.

The fliers that petitioner referred to were also introduced into evidence at the hearing. Under a heading labeled "Assistance Provided According to Need" there is a section that specifies that the Red Cross would give aid to "Physically or Emotionally Affected Individuals and Their Families." In particular, this section of the brochure states that the Red Cross can provide "[f]inancial assistance with mortgage, rent, utilities, *monthly bills*, food and clothing." (Emphasis added.) In another section, the "Emergency Family Gift Program," under the same heading, it states that there is "[i]mmediate cash assistance to aid families of the victims of the World Trade Center." Finally, under the heading "Eligibility for American Red Cross Services," it lists "[p]hysically and or emotionally affected individuals and their families" as a group that the Red Cross hoped to help. Contrary to respondents' position, there is nothing in these fliers that requires that a recipient be "laid off" or terminated from employment in order to receive aid. Furthermore, it stands uncontroverted that petitioner was affected by the tragedy of September 11th. Therefore, contrary to the unsupported allegations of the dissent that the petitioner had to have suffered some "economic injury," the petitioner was entitled to the aid he received, which was the determination reached by the Red Cross itself in 2001 when it gave the gift of financial assistance to petitioner and told him to keep it the next day. Respondents have utterly failed to establish any evidence to the contrary. Similarly, the dissent's argument that the Port Authority properly resolved this issue against the petitioner based upon "common sense" is nothing more than crediting the Port Authority's speculation as to respondent's eligibility. The dissent's query on why the Red Cross worker would have written down that respondent was laid off if "that fact had [no] relevance to his entitlement" only compounds the hopeless speculation. Thus, there was no basis for the hearing officer, or respondents, to find that petitioner did anything wrong by receiving aid from the Red Cross.

In addition, that a Red Cross representative may have misinterpreted petitioner's statement that he was displaced

---

**3.** Petitioner supplied proof in the form of his phone records to demonstrate that he did call the Red Cross the following day.

(which respondents concede he was) is inconsequential and cannot stand as a reason to fire petitioner. The petitioner testified that he never read the document relied on by respondents and the hearing officer. He certainly never swore to the truth of its statements and his signatures on the document cannot be construed as such an attestation. Even if petitioner had falsely represented that he was unemployed at the time, because being unemployed was not a prerequisite to receiving the assistance he collected, any such misleading statement is irrelevant and the conclusion that he lied to receive aid is inaccurate. He qualified for the aid in any event. Therefore, there is no basis to conclude that petitioner lied to receive the funds in question.

Also unavailing is respondents' argument that the petitioner is guilty of some wrongdoing because the application for aid reports that petitioner wanted the funds to pay for utilities, credit cards and groceries, while petitioner testified that he needed the money for future childcare, and yet actually used the funds to pay for past childcare arrears. Indeed, there simply was no condition placed upon petitioner's use of the money. That he found it more important to pay for childcare arrears, rather than future childcare services is not evidence of any guilt or wrongdoing.

Furthermore, respondents' position (as well as that of the hearing officer) that petitioner's written statement to investigators for the Office of the Inspector General containing an apology, indicates that petitioner must have done something wrong because he felt guilty enough to apologize, is preposterous. After receiving *Miranda* warnings, petitioner made a written statement that he applied for Red Cross aid that he understood from friends was available to victims of the World Trade Center attacks. In his statement, petitioner wrote that he was worried about the after-school program arrears he owed. He spoke to a caseworker and told her he worked for the Port Authority and gave her his identification card. She asked petitioner whether he was at work or at home and petitioner responded that he was at home and that the Port Authority had set up a command station. The Red Cross worker asked if petitioner would be called back to work and he answered yes, but that he did not know when. He told the representative he did not need money to pay his rent, but he did owe money for his children's programs. According to petitioner's statement, the caseworker told him that he could have $560 to use for whatever he needed and a food voucher, and she gave him a list of grocery stores

that accepted the voucher. She asked petitioner whether he had any other bills, he said he did not have any "on him," and she asked him to come back the next day so that the Red Cross could help pay those other bills. According to the statement, the representative also stated that she would keep his case open.

Petitioner then wrote that he did not return the next day, and that he felt bad about what he did. He spoke to a friend the next day and thought he should clarify that he would continue to receive his paychecks, so he called the Red Cross and informed a representative. That representative told him it was up to him, but that if he needed the money he should keep it. He stated that he cashed the check and used it to pay for his children's after-school childcare arrears, and used the food voucher for food. Finally, the petitioner wrote that he never did anything like this before, that he realized that what he did was wrong, that he never intended to hurt anyone, and will repay the money.

Petitioner stated at the hearing that he sought out the Inspector General's Office to explain what had happened. Petitioner then told the hearing officer the circumstances surrounding the making of his written statement. He explained that he was there for a few hours, that he was very scared and nervous, that he is not a good writer and it takes him "forever to write something and think it through." He also stated that he wrote and rewrote his signed statement, that the investigators wanted him to hurry, that he told them he was "stressed out" and needed childcare assistance, that he had mixed feelings about taking the charity because of the way he was raised and that "[y]ou don't go on welfare[,] [t]here are certain things you don't do." Petitioner also testified that he was grateful to the Red Cross for what they did and how they helped people, and so he wanted to repay them in the future.

Petitioner said at the hearing that he made the apology in his written statement because he was afraid that child welfare services would take his children away. When asked by the hearing officer why he thought that his children could be taken from him if he did nothing wrong, petitioner responded that he had had dealings with the Department of Child Welfare in Atlanta and felt if he were also arrested[4] he would lose his children. He testified that he apologized because he "just wanted this to go

---

**4.** Petitioner stated that he knew that those who filed allegedly false statements to receive financial assistance from various organizations such as the Red Cross, had been arrested. On January 29, 2002, petitioner was arrested

away" and that by the end of the session with the investigators, that is how he felt. He did not think, however, when he received the check originally, that he had done anything wrong. His psychologist, Dr. Axel, explained that petitioner always had been made to feel guilty whenever he had asked for anything for himself even if he had not engaged in any wrongdoing. Petitioner clearly felt badly for having asked for charity.

From the above recitation of the record, it is unclear how the hearing officer could have gleaned that petitioner did anything wrong. In any case, how petitioner felt at any given point in this investigation is irrelevant to the analysis since he did not engage in any wrongdoing, nor was there any basis in this record to conclude that he had. The respondents' reliance on the exchange at the hearing and the petitioner's unsworn written statement which was probative of nothing but petitioner's baseless feelings of guilt and fear, underscores the baseless nature of the challenged determination.

The dissent urges that the entire matter distills to credibility determinations that the respondents were free to resolve against the petitioner. However, the evidence of record does not support any credibility determination made by the respondents. The law does not allow the respondents to substitute their personal feelings and prejudices, in the guise of credibility findings, for evidence. *Nihil nequam est praesumendum.*[5]

Finally, the respondents argue that the petitioner's actions violated several Port Authority rules. One such rule prohibits any attempt by petitioner to use his employment to secure unwarranted benefits. Petitioner did not use his employment to secure benefits as he was entitled to the benefits he received regardless of his employment status or the Red Cross' understanding of his employment status. Another rule requires that petitioner be honest and accurate in presenting information. There is no evidence that petitioner failed to abide by this provision. Indeed, the only evidence of record is that he told the representative at the Red Cross center that he was displaced, not that he was unemployed, and that he would be returning to work when called back. Respondents do not contend that this was inaccurate information. The petitioner, in any event, tried to dispel any misconceptions by calling the Red Cross the next

---

and charged with filing a false instrument, falsifying a business record, and petit larceny. On October 22, 2002, the criminal matter was disposed of by the issuance of an adjournment in contemplation of dismissal.

5. Nothing wicked is to be presumed.

day. The other rules that the petitioner is alleged to have violated require that petitioner not "bring discredit" to the Port Authority. It remains unclear from the record of this proceeding just how petitioner brought discredit to the Port Authority by asking for assistance from the Red Cross to which he was entitled.[6]

In any event, even if there had been substantial evidence of record to support the determination, the penalty may not be upheld as it is " 'so disproportionate to the offense as to be shocking to one's sense of fairness.' " (*Matter of Kelly v Safir*, 96 NY2d 32, 38 [2001], quoting *Matter of Pell v Board of Educ. of Union Free School Dist. No. 1 of Towns of Scarsdale & Mamaroneck, Westchester County*, 34 NY2d 222, 237 [1974].) Indeed, petitioner collected a total of $560 and a food voucher for which he was terminated from his position (as well as arrested). Just as a 19-year jail sentence is too harsh for stealing a loaf of bread, the impact of such penalty upon an employee in good standing of 15 years is too severe in light of any alleged misconduct, and disproportionate to any harm suffered by the Port Authority or the general public. (*See Matter of Kelly v Safir*, 96 NY2d at 38, 39.) The penalty constitutes an abuse of discretion as a matter of law.

The dissent's reliance on the horrific events of September 11th to justify respondent's decision to terminate petitioner is nothing more than an unfortunate use of a "great national tragedy" as a legal argument. The tragedy does not alter the basic requirements of evidence of wrongdoing to support the termination, evidence that is glaringly absent from the record.

In sum, petitioner's termination rested on a single sentence (that he was "laid off") not directly attributable to him, that he did not swear to or even read. As there is no substantial evidence of record upon which to base the determination, the decision at issue is without a rational basis and must be vacated.

Accordingly, the determination of respondent Port Authority of New York & New Jersey, dated May 14, 2003, which dismissed petitioner from his position as a Port Authority employee, is annulled, without costs, the petition granted, the petitioner reinstated, and the proceeding (transferred to this Court by order of the Supreme Court, New York County [Sheila Abdus-

---

6. Such a baseless finding could create an unwanted chilling effect on similarly situated victims who are eligible for charitable assistance, resulting in the exact situation that the rules are meant to eschew.

Salaam, J.], entered March 11, 2004) remanded to Supreme Court for the determination of an award for lost wages, benefits and all emoluments of his employment from the date of separation to the date of reinstatement.

FRIEDMAN, J. (dissenting). Respondent Port Authority of New York & New Jersey (the PA) formerly maintained its principal offices at the World Trade Center, which, as is well known, was completely destroyed in the terrorist attacks of September 11, 2001. In spite of the deaths of 75 of its employees and the radical disruption of its operations, the PA fully met its payroll obligations to its surviving employees in the weeks following this devastating catastrophe. There were no layoffs, and no PA employee missed a single paycheck.

Unfortunately, a very small number of PA employees misrepresented their post-September 11th employment status in order to obtain monetary assistance that charitable organizations, such as the American Red Cross, were offering to victims of the attacks. The PA was understandably concerned that the public reputation of the entire organization was being damaged by reports in the media that certain PA employees had engaged in this kind of dishonest behavior. Such damage to the PA's reputation was particularly unfair to the vast majority of PA employees who had not succumbed to the temptation to act in this manner.

To address this threat to its reputation, the PA adopted a consistent policy of dismissing any employee who, although financially unaffected by the attacks, was found to have used false pretenses to obtain aid that should have gone to a person in genuine need. As the PA explains in its brief on this appeal:

"The [PA] is a public agency that operates in the public trust. If the [PA] did not react with a strong response when its employees violated that trust, the credibility of the agency itself would be compromised. The [PA] received a great deal of publicity regarding employees who took Red Cross funds under false pretenses, and there was a need to protect the reputation of the agency."

While this policy might be characterized as strict—perhaps more strict than the policy the members of this bench would apply if it were our responsibility to manage the PA—it cannot be said that the policy is arbitrary or irrational. And, crucially, it is the management of the PA, not the judiciary, that has been vested with the power to make the relevant policy choice.

Pursuant to the policy described above, the PA terminated petitioner's employment based on its posthearing finding that,

in an attempt to obtain financial assistance, he had falsely represented to the Red Cross that he had been laid off due to the destruction of the World Trade Center. The record indicates that the PA's treatment of petitioner was entirely consistent with its treatment of other employees found to have engaged in similar misconduct. In *Matter of McAllister (Commissioner of Labor)* (301 AD2d 1012 [2003]), for example, the Appellate Division, Third Department, held that a former PA employee was correctly disqualified from receiving unemployment insurance benefits because the off-duty conduct for which he had been terminated—applying for financial assistance under the false pretense that the September 11th attacks had left him a "displaced worker"—"reflect[ed] adversely upon the employer's integrity" (*id.*). In addition, the record contains grievance rulings upholding the terminations of three union-affiliated PA employees (Villa, Kassonbola, and Figuerdo) found to have acted similarly, at least two of whom were (unlike petitioner) actually in the building when the plane hit. Notably, the record reflects that the subject employees in *McAllister* and the aforementioned grievance proceedings each earned far less than petitioner's former annual salary of $61,984.

In this proceeding under CPLR article 78, petitioner challenges the PA's factual findings of misconduct that provided the basis for his dismissal. Today, the majority grants petitioner all of the relief he seeks (indeed, it does not even require petitioner to make good on his offer to repay the money to the Red Cross), based on its own de novo review of the evidence presented at the administrative hearing that resulted in petitioner's termination. The majority substitutes its own assessment of the petitioner's credibility for that of the agency, reweighs the evidence, and renders its own findings of fact based on the administrative record. As a justification for doing all this—in disregard of well-established law, as discussed below—the majority repeatedly states, in various formulations, that there is "no substantial evidence of record" to support the PA's determination that petitioner obtained Red Cross aid on false pretenses. This is flatly wrong. The inescapable fact is that a contemporaneous document, written by a Red Cross worker based on what she was told by petitioner, and signed by petitioner in two places, reflects that petitioner told the Red Cross that he had been laid off. Moreover, petitioner's subsequent written statement to the PA apologizing for his actions plainly shows his consciousness of guilt. This evidence—and it

is evidence, no matter how many times the majority claims otherwise—provides ample support for the PA's determination that petitioner misrepresented his employment status to the Red Cross. Further, the PA was not bound to credit petitioner's self-serving attempts to explain such evidence away, as the majority—substituting its own judgment for that of the PA—chooses to do.

In annulling the PA's dismissal of petitioner, the majority adopts an approach that the Court of Appeals has specifically instructed us not to take in reviewing the determination of an administrative agency under article 78. The Court of Appeals has held that, in reviewing a posthearing administrative determination under the "substantial evidence" standard of CPLR 7803 (4), a court has neither the "power to upset the determination of an administrative tribunal on a question of fact," nor the "right to review the facts generally as to weight of evidence" (*Matter of Pell v Board of Educ. of Union Free School Dist. No. 1 of Towns of Scarsdale & Mamaroneck, Westchester County*, 34 NY2d 222, 230 [1974] [internal quotation marks and citations omitted]). Thus, an administrative agency's determination concerning the credibility of a witness who has testified before it at an evidentiary hearing is "largely unreviewable by the courts" (*Matter of Berenhaus v Ward*, 70 NY2d 436, 443 [1987]; *see also Matter of Rodriguez-Rivera v Kelly*, 2 NY3d 776, 777 [2004] [the Appellate Division "improperly substituted its credibility determinations for those" of the agency], *revg* 3 AD3d 379 [2004]). Stated otherwise,

"where from the evidence either of two conflicting inferences may be drawn, the duty of weighing the evidence and making the choice rests solely upon the [administrative agency]. The courts may not weigh the evidence or reject the choice made by [such agency] where the evidence is conflicting and room for choice exists" (*Berenhaus*, 70 NY2d at 444, quoting *Matter of Stork Rest. v Boland*, 282 NY 256, 267 [1940]).

As is evident from the writing of the majority itself, there was substantial evidence to support the PA's determination that petitioner, in violation of the rules to which he was subject as a PA employee, used false or misleading pretenses to obtain financial assistance from the Red Cross.* Although there may have been "room for choice" (*Berenhaus*, 70 NY2d at 444) be-

---

* The PA found petitioner to have violated the following provisions of the "General Rules and Regulations For All Port Authority Employees":

tween inferences favorable and unfavorable to petitioner, that choice was for the PA to make. Since the PA's factual determination is supported by substantial evidence in the administrative record, we are bound to confirm that determination, whether or not we would reach the same conclusion ourselves.

Petitioner was employed as a senior product consultant in the Technology Services Department at the PA's offices in the World Trade Center. When petitioner emerged from the subway on his way to work on the morning of September 11, 2001, the attacks had already occurred, and petitioner was still in the vicinity of the World Trade Center when the first of the towers collapsed. Thus, petitioner, along with thousands of others, experienced the trauma of directly witnessing the devastation wrought by the attacks, although he was not physically injured. As a result of the destruction of the PA's offices, petitioner had nowhere to work for some time after September 11th, but it is undisputed— and critical to the proper disposition of this proceeding—that, as previously discussed, petitioner was never laid off by the PA, and that the PA continued paying his salary throughout the period of the displacement.

On October 4, 2001, petitioner visited the Red Cross site on Carmine Street, and a Red Cross worker filled out a form entitled "Disaster Registration and Case Record" based on the information he provided. A notation on the form states that "[c]lient [petitioner] is presently layd [*sic*] off and will be called back to work as soon [as] the company will relocate." On this basis, according to the notation, petitioner requested financial assistance from the Red Cross to cover expenses for utilities, credit cards and groceries. According to another notation on the form, "[c]lient states that he is helpful [*sic*] that as soon as the

---

Chapter 2 ("Ethics"), paragraph 1: "No employee may, directly or indirectly, use or attempt to use his employment with the Port Authority to secure unwarranted privileges, exemptions or other benefits for himself or others."

Chapter 2 ("Ethics"), paragraph 3: "It is imperative that employees be honest and accurate. In presenting information, if you are not sure of all the facts or details, or their completeness, be sure to indicate the limits to which you can vouch for its accuracy."

Chapter 3 ("Conduct Off the Job"), paragraph 1: "Time off duty should not be used in a manner which is likely to hinder employees from the efficient performance of their duties or to bring discredit upon the Port Authority."

Chapter 4 ("Public Relations"), paragraph 1: "No employee shall commit any act or neglect any duty which in any way is prejudicial to good order, discipline, or efficiency, or reflects unfavorably upon the good name or reputation of the Port Authority or those of the general public, whether or not such act or neglect is specifically mentioned in these rules."

company relocate[s] he will be called back to work." Petitioner signed the form, and was issued a check for $571 that day, and, a month later, a food voucher for $95.

On October 5, 2001 (the day after his visit), petitioner called the Red Cross (as his telephone records confirm). According to petitioner's testimony, he called the Red Cross to clarify that he was still receiving his salary. Petitioner testified that the Red Cross worker to whom he spoke (who was not identified) told him he could keep the money. Petitioner's testimony about the content of the call is uncorroborated.

In November, after learning from news reports that other PA employees had been arrested for obtaining financial assistance from relief agencies, petitioner told his supervisor that he had obtained funds from the Red Cross. Thereafter, he spoke to the PA's Inspector General, and, after being advised of his *Miranda* rights, completed a handwritten statement apologizing for his conduct in dealing with the Red Cross. Among other things, petitioner stated in this document that he would repay the money. Petitioner also stated: "I have never done anything like this before. I'm sorry, and I didn't mean any harm or hurt to befall anyone." Although petitioner's handwritten statement did not admit to having claimed to have been laid off, the document did admit that he had told the Red Cross worker on October 4th that he was not working and was waiting to be called back to work. At the hearing, however, petitioner denied that he had misled the Red Cross in any way, and explained the apologetic nature of his handwritten statement as the result of his guilt about asking for charity (whether warranted or not) and of his fear that the child-welfare authorities would take away his children (actually, his sister's children, who were living with him) if he were arrested.

The majority seems to believe that repetition of the phrase "no substantial evidence of record" (or words to similar effect) will suffice to establish that there really is no evidence to support the PA's determination that petitioner misled the Red Cross. The majority cannot, however, wish away the contemporaneous application form—signed by petitioner in two places— stating that he told the Red Cross worker he had been laid off as a result of September 11th. Indeed, the majority contradicts its own "no substantial evidence" assertion when it acknowledges, in the final paragraph of its writing, that "petitioner's termination rested on a single sentence (that he was 'laid off')" in the Red Cross application form. If that "single sentence" is

not evidence, I do not know what is. Further, the evidence of petitioner's misconduct provided by that "single sentence," far from being uncorroborated (as the majority wrongly implies), is confirmed by the handwritten apology petitioner submitted to the PA, thereby evidencing his consciousness of guilt.

The majority seeks to justify its disregard of the documentary evidence supporting the PA's factual determination by treating as established fact every self-serving explanation petitioner offered for that evidence at the hearing. Thus, the majority chooses to believe petitioner's claims that he did not make the statement about being laid off attributed to him by the application form; that he did not read the application form before signing it; and that, when he wrote the statement apologizing for his conduct, he was motivated by irrational fear and embarrassment at having taken charity. The weight to be given such testimony is, however, a credibility issue committed by the Legislature to the PA's determination, and there is no legal basis for this Court to set aside the PA's refusal to accept petitioner's self-serving after-the-fact explanations and rationalizations. Whatever testimony petitioner gave at the hearing, the PA had every right to give greater weight to a document prepared as a contemporaneous record of his oral statements, by a Red Cross worker who had no motive to misrepresent those statements, and signed by petitioner in two places. The majority's annulment of the PA's action becomes even more difficult to understand when one considers that petitioner's handwritten apology, clearly evidencing his guilty conscience, corroborates the evidence of his guilt appearing on the face of the Red Cross application form. Further, the majority's reference to the fact that petitioner did not swear to the truth of the information in the application form is irrelevant, given that this is not a perjury prosecution.

The majority also asserts, without the slightest evidentiary support, that the PA has substituted unspecified "personal feelings and prejudices, in the guise of credibility findings, for evidence." If such an ad hominem attack suffices to overturn administrative findings, little remains of the fact-finding authority of public agencies—or, for that matter, of the separation of powers—in this state. Needless to say, the record does not contain a scintilla of evidence that anyone's "personal feelings and prejudices" improperly influenced the PA's decision to terminate petitioner. I regret that the majority resorts to such baseless charges to camouflage its abandonment of well-established principles of administrative law.

The majority further argues that the PA wrongly determined that petitioner did not qualify for financial assistance under the Red Cross's guidelines for the distribution of aid. Once again, the majority erroneously engages in a de novo review of a factual issue that the PA has already decided rationally and with substantial evidentiary support. The Red Cross guidelines set forth several categories of affected people, and, for each category, the kinds of assistance for which such people were eligible. True, the guidelines state that "Physically or Emotionally Affected Individuals and Their Families" were eligible for (among other kinds of aid) "[f]inancial assistance with mortgage, rent, utilities, monthly bills, food and clothing," and there is no reason to doubt petitioner's claim that he was emotionally affected by the disaster. Still, while petitioner's emotional condition may have entitled him to nonfinancial aid (such as counseling), the fact remains that the attacks had no economic effect on him. Even if the Red Cross aid guidelines are sufficiently ambiguous to be construed to make persons only emotionally affected by the attacks eligible for financial assistance, the PA was entitled to resolve that ambiguity, in light of common sense, against petitioner. After all, why would the Red Cross worker have written down on the form that petitioner had been laid off—and why would petitioner have claimed to have been laid off—if neither one believed that fact had any relevance to his entitlement to financial assistance? The majority's response—to label as "speculation" the PA's rational inferences from the available evidence—makes a mockery of the deferential standard of review we are required to apply in an article 78 proceeding.

Even if the majority were correct that the evidence established that petitioner was technically eligible for financial assistance from the Red Cross at the time he made his application—and, to reiterate, the evidence establishes no such thing—the PA could still reasonably conclude, as it did, that petitioner's misrepresentation of his employment status demonstrated that he intended to mislead the Red Cross. Regardless of petitioner's actual eligibility, his attempt to mislead the Red Cross about something he believed to be material to his application clearly would constitute conduct "reflect[ing] unfavorably upon the good name or reputation of the [PA]," in violation of chapter 4, paragraph 1, of the code of conduct for PA employees (*see* n at 48-49). Stated otherwise, it would reflect unfavorably on the PA's reputation if petitioner attempted to deceive the Red Cross about a matter he believed was material to his eligibility for

financial assistance, even if, unbeknownst to petitioner, that matter in fact was not material to his eligibility. Such conduct would also violate petitioner's obligation, under chapter 3, paragraph 1, of the PA employees' code of conduct (see n at 48-49), to refrain from conduct "bring[ing] discredit upon the [PA]" while off duty.

Petitioner also argues that, even if the PA's factual findings of misconduct are supported by the record, its decision to dismiss him as a penalty for such misconduct is so disproportionate as to constitute an abuse of discretion. The majority agrees, finding it "shocking to one's sense of fairness" (*Matter of Kelly v Safir*, 96 NY2d 32, 38 [2001], quoting *Matter of Pell v Board of Educ.*, 34 NY2d at 237) that the PA chose to terminate petitioner's public employment based on his use of false pretenses to obtain financial assistance from the Red Cross. The majority thus requires the PA to treat petitioner more leniently than it has treated other employees found to have acted similarly (as previously discussed), thereby mandating that the PA set aside its duly considered policy of intolerance for attempts by its employees to profit dishonestly from September 11th. While the majority may find it gratifying to require the PA to give a free pass to employees who have obtained charity under false pretenses, there is no principled justification for the majority's substitution of its own policy preference for the rational, nonarbitrary, and lawful policy the PA has chosen for itself, and has consistently applied.

A public agency such as the PA has a vital interest in maintaining a reputation for integrity, and, to that end, the PA requires its employees to meet a certain standard of ethical conduct. It is not for this Court to dictate to the PA that it should be more tolerant of employee conduct that fails to meet the agency's standards. In dismissing petitioner, the PA obviously was seeking to hold its employees, who had been spared the loss of income that tragically befell so many others, to a standard of conduct that excluded the use of false pretenses to obtain financial assistance that was intended to benefit persons who did suffer financial loss. At a time of great national tragedy, the PA believed that it, and the general public it serves, had a right to demand at least this level of integrity from its employees. In annulling petitioner's dismissal, the majority requires the PA to expect and accept less from its employees. This is not the purpose of article 78 review.

Of course, if the penalty question were committed to this Court's discretion, we might well exercise our discretion to

impose a penalty less severe than dismissal. The discretion to be exercised, however, is the PA's, not this Court's. Given the PA's substantial interest in setting and maintaining a standard of ethical conduct for its employees, it cannot be said that the penalty of dismissal was, as a matter of law, "disproportionate to the misconduct, or to the harm to the agency or the public in general" (*Matter of Kelly v Safir*, 96 NY2d at 38).

Nor will it do for the majority to assert that the dismissal of a public employee found guilty of dishonesty is as disproportionate as the "19-year jail sentence . . . for stealing a loaf of bread" that serves as a plot device in Victor Hugo's *Les Misérables*. I do not minimize the difficulty petitioner will face in finding a new job. Still, it is nonsense to say that losing one's job—a common occurrence in our society, and a misfortune that every day befalls many who have done nothing wrong—is the equivalent of a lengthy prison term.

In closing, I feel compelled to remark upon the majority's statement that it is "unfortunate" that I have made reference to a "great national tragedy" (my phrase) in a supposed effort to find a substitute for the evidence the record does not provide to support my position. As I have already discussed at length, the majority's claim that there is no evidence to support the administrative action under review does not bear scrutiny. Further, the majority's discomfiture at my reference to the events of September 11th is difficult to understand in view of the contents of the record and briefs before us, which make clear that this proceeding is inextricably bound up with the September 11th attacks and their aftermath. Petitioner has consistently stressed his status as a victim of the attacks (albeit not in a financial sense, as he now admits), and the majority writing itself discusses at great length the impact September 11th had on petitioner. Meanwhile, the PA, in seeking petitioner's dismissal and in its present defense of that action, has emphasized that it terminated petitioner as part of an effort to limit the damage to its reputation that resulted from the swirl of publicity about PA employees who sought financial aid on the false pretense that they had been laid off after the attacks. Further, as previously indicated, the PA's right to terminate an employee on precisely these grounds has been upheld by the Appellate Division, Third Department, and in three union grievance proceedings. Because substantial evidence in the record establishes that the PA's dismissal of petitioner was a rational, nonarbitrary response to the threat to its corporate good name

arising from the conduct of a number of its employees in the wake of September 11th, and the penalty cannot be said to shock the judicial conscience, I would confirm the PA's action.

MAZZARELLI, J.P., SAXE and NARDELLI, JJ., concur with CATTERSON, J.; FRIEDMAN, J., dissents in a separate opinion.

In this proceeding brought pursuant to article 78 of the Civil Practice Law and Rules (transferred to this Court by order of the Supreme Court, New York County, entered March 11, 2004), the determination of respondent Port Authority of New York & New Jersey, dated May 14, 2003, which dismissed petitioner from his position as a Port Authority employee, is annulled, without costs, the petition granted, the petitioner reinstated and the proceeding remanded to Supreme Court for the determination of an award for lost wages, benefits and all emoluments of his employment from the date of separation to the date of reinstatement.